**STATE of Missouri, Respondent,**

v.

**Mary FROST, Appellant.**

**No. WD 58078.**

Missouri Court of Appeals,
Western District.

June 5, 2001.

Andrew A. Schroeder, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Mazza Follett, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

Mary Frost was convicted by a jury of murder in the second degree, § 565.021.1, RSMo 1994,[1] and armed criminal action, § 571.015. She was sentenced as a prior offender under § 558.016 to a term of eighteen years' imprisonment for the second-degree murder conviction and three years' imprisonment for the armed criminal action conviction with the sentences to run concurrently. On appeal, Ms. Frost alleges that the trial court erred in refusing to instruct the jury on the offense of involuntary manslaughter, a lesser-included offense of murder in the second degree. She claims that the evidence provided a basis for both an acquittal on murder in the second degree and a conviction for involuntary manslaughter. First, Ms. Frost alleges the jury could have reasonably found that she recklessly, rather than knowingly, caused the death of Oscar Fin-

---

**1.** All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise noted.

gers. Alternatively, she claims the jury could have reasonably found that she stabbed Mr. Fingers to defend herself from being raped, without the purpose of causing great harm, but in doing so used a degree of force that was a gross deviation from what a reasonable person would use in the same circumstances. Because the facts of this case supported giving an involuntary manslaughter instruction, the trial court erred in failing to instruct on involuntary manslaughter and the error prejudiced Ms. Frost. Reversal of Ms. Frost's conviction for second-degree murder also requires reversal of her conviction for armed criminal action. Thus, the judgment of the trial court is reversed and this case is remanded for a new trial.

## Statement of Facts

█ Because this case involves the sole issue of whether a basis existed to support instructing on a lesser included offense, this court "recite[s] the facts and review[s] the evidence in the light most favorable to the defendant." *State v. Battle*, 32 S.W.3d 193, 195 (Mo.App.2000). In June 1998, Ms. Frost was living in Oscar Fingers' home. Mr. Fingers, seventy-seven at the time of his death, had agreed to let Ms. Frost stay in his home at the request of Ms. Frost's mother, Rose Johnson, whom Mr. Fingers knew.

On the night of June 17th, Ms. Frost called her mother from Mr. Fingers' home. Ms. Johnson's granddaughter answered and told Ms. Frost that Ms. Johnson would call her back. When Ms. Johnson called back, Ms. Frost was hysterical and stated that Mr. Fingers had tried to rape her. Ms. Johnson overheard Mr. Fingers tell Ms. Frost to "put his damn phone down" and that she did not need to call the police.

After at least two more telephone conversations with Ms. Frost, Ms. Johnson drove with Ms. Frost's brother, Robert Frost, to Mr. Fingers' home. When they arrived, Ms. Frost was very upset. Mr. Frost went to check on Mr. Fingers and found him lying unconscious in the bathroom. The police were then called.

Officer Burnett of the Kansas City, Missouri Police Department arrived at Mr. Fingers' home just before 1 a.m. on June 18th. Ms. Johnson and Mr. Frost were waiting on the porch when Officer Burnett arrived and directed him to the bathroom. Officer Burnett found Mr. Fingers lying on his stomach between the sink and the toilet. When he rolled Mr. Fingers over, Officer Burnett observed blood on his shirt. Mr. Fingers was not breathing. Mr. Fingers was later transported to the hospital, where he was pronounced dead.

Soon thereafter, Officer Keith Kirchoff arrived at the scene. After obtaining Ms. Frost's consent to search the house, he entered and observed broken pieces of furniture, a broken lamp, and other items scattered about the house. What appeared to be drops of blood were found on the floor and walls near the front door and on a chair in the living room. A small amount of blood and a bloodstained washcloth were found in the bathroom. Officer Kirchoff also found Mr. Fingers' Viagra prescription bottle, containing one of the six pills prescribed.

Ms. Frost told the officers that she had stabbed Mr. Fingers and indicated the knife she had used was in a kitchen drawer along with other knives. Officer Melissa Thompson observed some bruising on the top of Ms. Frost's foot and shin and a small cut on her ankle. Ms. Frost was transferred to police headquarters shortly thereafter. After waiving her *Miranda*[2]

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rights, Ms. Frost made a videotaped statement in which she relayed the events of the night. The State introduced the tape as evidence at Ms. Frost's trial.

According to Ms. Frost, she was sitting in the living room watching television and listening to music with headphones when Mr. Fingers approached her. He asked Ms. Frost if he could have sex with her. Ms. Frost replied "no" and stated that he had just had sex the previous day. She stated, "I mean, at your age, ... (inaudible) you can't even have sex." Mr. Fingers asked several more times and Ms. Frost refused. Mr. Fingers then went to his bedroom.

When the program she was watching ended, Ms. Frost went to bed. As she lay there, she felt the bed shake and turned to see Mr. Fingers, who was again asking her for sex. Ms. Frost told him no several times and then got out of bed and went to a couch in the living room. Mr. Fingers followed her into the living room and the two began to argue because Mr. Fingers did not want Ms. Frost to lay on the couch. After telling Mr. Fingers that she would not damage the couch by lying on it, Ms. Frost took her pillow and sheet and sat in a chair listening to music on her headphones.

After again asking for sex, which Ms. Frost refused, Mr. Fingers went to the front door of the house, opened it and looked out. At this point Mr. Fingers became angry, shut the door and told her that she was in his house and he would do whatever he wanted to in his house. Mr. Fingers again asked if she would have sex with him. Ms. Frost again told him no, and as she stood up from her chair, Mr. Fingers struck at her, knocking the headphones from her head. Ms. Frost went to the kitchen and got a knife. She then noticed that the locks on the door were locked, and this scared her. She took the knife and returned to her chair, warning Mr. Fingers to stay away from her.

Mr. Fingers again approached her on his knees, asking her for sex. Ms. Frost kicked at him from her chair. Mr. Fingers then reached for her and she jumped up and "stuck him" with the knife. He stated, "Oh, you gonna get it now." The two began fighting, scattering things about the room in the process. Ms. Frost swung a lamp at Mr. Fingers, but missed.

Ms. Frost then ran into the kitchen. When Mr. Fingers went to the bathroom, she called her mother and told her what had happened. Her mother asked where she had cut Mr. Fingers and Ms. Frost replied, "Momma I don't know where I cut him at, momma, I wasn't trying do that, I told him no, he couldn't have sex with me...." Her mother told her to take a towel to Mr. Fingers. Ms. Frost hung up the phone and went to Mr. Fingers in the bathroom. When she went into the bathroom, Mr. Fingers was sitting on the toilet stool with the knife in his hand. Ms. Frost told Mr. Fingers that she was going to call the police, but he said, "No, no, this my goddamn house, you don't call the police." After Ms. Frost gave Mr. Fingers the towel, he rinsed the knife and told her to take it. Ms. Frost took the knife and put it in the kitchen drawer and called her mother again. After speaking to her mother, she went back to the bathroom and saw that Mr. Fingers had fallen from the toilet stool. She stated that "he started going 'oooh ... ooh, ooh' like this and I'm like 'Yeah, get up, you just want some attention.'" She then spoke to her mother again, who asked her what Mr. Fingers was doing. Ms. Frost told her, "Momma now he laying on the floor, trying to get some attention." Sometime later, her mother and brother came to the house.

Dr. Thomas Young, medical examiner for Jackson County, performed the autop-

sy on Mr. Fingers. The fatal stab wound was two and one-half inches above Mr. Fingers' left nipple and four to six inches deep, angled slightly downward. It partially broke one of Mr. Fingers' ribs, punctured a portion of his lung, and penetrated the front of his heart. This penetration of the heart caused bloody fluid to collect within the pericardial sac. A number of small wounds and scrapes were also found on Mr. Fingers' body. On cross-examination, Dr. Young also testified that, "considering the location [of the stab wound], it wouldn't really take that much force" to create the wound that killed Mr. Fingers. He also stated that due to the nature of the stab wound, which resulted in a gradual blood loss, Mr. Fingers would have been able to maintain his activity level for a time after the stabbing.

A trial was held on October 19–21, 1999, at which Ms. Frost was convicted by a jury of murder in the second degree and armed criminal action. She was sentenced concurrently to a term of eighteen years' imprisonment for the second-degree murder conviction and three years' imprisonment for the armed criminal action conviction. This appeal follows.

### Trial Court Erred in Failing to Submit Involuntary Manslaughter Instruction

In her only point on appeal, Ms. Frost contends that the trial court erred in refusing her proffered instruction on the lesser-included offense of involuntary manslaughter. She claims that as a lesser-included offense of second-degree murder, involuntary manslaughter should have been submitted to the jury. The evidence, she contends, provided a basis for both an acquittal on murder in the second degree and a conviction for involuntary manslaughter. She argues that the jury could have reasonably found that she either recklessly, rather than knowingly, caused the death of Mr. Fingers or that she intentionally stabbed him to defend herself from being raped, not with the purpose to cause great harm, and in doing so recklessly used a degree of force that was a gross deviation from what a reasonable person would use in the same circumstances.

"A trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction on the lesser offense, and if such instruction is requested by one of the parties or the court." *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996). "Doubt as to whether to instruct on the included offense is to be resolved in favor of instructing on the included offense." *State v. Yacub*, 976 S.W.2d 452, 453 (Mo. banc 1998).

Involuntary manslaughter is a lesser-included offense of second-degree murder. § 565.025.2(2)(b). In determining whether the trial court erred in refusing the involuntary manslaughter instruction, this court must look first at the basis for that decision. In this case, the jury was instructed on second-degree murder, voluntary manslaughter and self-defense. Ms. Frost offered an instruction on involuntary manslaughter, but the trial court refused the instruction after the State argued that to give an instruction on involuntary manslaughter would be inconsistent with the defense submission of voluntary manslaughter and self-defense. The State based this argument on *State v. Albanese*, 920 S.W.2d 917, 925 (Mo.App.1996), *State v. Isom*, 906 S.W.2d 870, 873 (Mo.App. 1995) and *State v. Beeler*, WD 55460, slip op., 1999 WL 506234 (Mo.App. July 20, 1999). Accepting the State's argument, the trial court refused submission of the involuntary manslaughter instruction.

The cases presented by the State were overruled a few months later by the Supreme Court, however, in *State v. Beeler*, 12 S.W.3d 294 (Mo. banc 2000), when the Supreme Court granted transfer from this court.[3] Thus, the basis upon which the trial court refused the instruction in this case was incorrect in light of the Supreme Court's decision in *Beeler*. Because *Beeler* involved a substantive matter, its holding applies to those cases pending on appeal when it was handed down. *State v. Hayes*, 23 S.W.3d 783, 791 (Mo.App.2000). This is such a case.

■ Thus, in light of the Supreme Court's finding in *Beeler* that an involuntary manslaughter instruction is not inconsistent with the submission of instructions on voluntary manslaughter and self-defense, this court must consider whether the facts of the case supported giving the involuntary manslaughter instruction. This requires a determination of whether there was a basis for conviction on the lesser-included offense of involuntary manslaughter and acquittal on murder in the second degree. *See Redmond*, 937 S.W.2d at 208. Under § 565.024, "[a] person commits the crime of involuntary manslaughter ... if he ... [r]ecklessly causes the death of another person." The Supreme Court defined "recklessness" in *Beeler*, 12 S.W.3d at 299:

> Recklessness resembles knowing conduct in one respect in that it involves awareness, but it is awareness of risk, that is, of a probability less than a substantial certainty. By contrast, to act knowingly is to be aware that the conduct is practically certain to cause the result. *Sec. 562.016.3.* In sum, reckless

conduct is not inconsistent with the intentional act of defending one's self, if in doing so one uses unreasonable force.

The Court noted that "the statutory definition of 'reckless' would include the conscious discharging of a firearm with disregard for a substantial and unjustifiable risk that death will result and that the conscious firing of the weapon constitutes a gross deviation from what a reasonable person would do to protect himself." *Id.* at 297. Involuntary manslaughter does not require that the act or result be accidental. *Id.*

Thus, this court must consider the evidence to determine whether a basis exists for convicting Ms. Frost of involuntary manslaughter and acquitting her of murder in the second degree. *See Redmond*, 937 S.W.2d at 208. On the night of the stabbing, Ms. Frost and Mr. Fingers were alone in his home. Mr. Fingers repeatedly approached Ms. Frost and asked her for sex despite her refusals. Mr. Fingers, ultimately, became angry and told Ms. Frost that he would do anything he wanted to do in his own house. He then approached Ms. Frost again asking for sex, and when she told him no and stood up, he struck her. When Ms. Frost went into the kitchen to get a knife, she saw that the exit from the home was locked and she became scared. She sat down with the knife and warned Mr. Fingers to stay away from her. When Mr. Fingers again approached, Ms. Frost began kicking at him to keep him away. Mr. Fingers then reached for her. Ms. Frost stood up and stabbed Mr. Fingers once in the chest. The two then engaged in a physical altercation, during

---

3. Moreover, even prior to its holding in *Beeler*, the Supreme Court had rejected the argument that an instruction should not be given simply because it is inconsistent with other instructions. *Redmond*, 937 S.W.2d at 209–

10. In *Redmond*, the Court held that "[e]ach instruction should be evaluated separately and should be given if supported by the evidence, without regard to whether the other instruction is also being given." *Id.* at 210.

which both appeared to have received minor injuries.

Ms. Frost called her mother, who asked if Ms. Frost knew where she had cut Mr. Fingers. Ms. Frost told her mother that she did not know. Ms. Frost brought a towel to Mr. Fingers and put the knife away as he told her to do. Mr. Fingers told her several times that he did not want her to call the police. Ms. Frost stated both to her mother and police officers during her videotaped statement that she was not trying to hurt Mr. Fingers and did not know where she had stabbed him. Ms. Frost indicated to police, "I really wasn't trying to hurt him, I just wanted him to leave me alone."

Presented with the involuntary manslaughter instruction, the jury could have reasonably found that Ms. Frost recklessly caused Mr. Fingers' death. Ms. Frost indicated that she had not intended to hurt Mr. Fingers, but was attempting to ward off his unwelcome sexual advances. The jury could have believed that Ms. Frost was attempting to defend herself, but either the need to defend or the manner in which she defended herself was unreasonable. *See Beeler,* 12 S.W.3d at 297–98.

The Eastern District recently considered a similar situation in *State v. Davis,* 26 S.W.3d 329 (Mo.App.2000). In that case, the defendant shot and killed a man who had accused the defendant of owing him money. *Id.* at 331. The defendant claimed that he shot the man in self-defense because he believed the victim was reaching for a gun to shoot him. *Id.* At trial, the court gave instructions for second-degree murder, voluntary manslaughter, and self-defense, but refused the defendant's request for an involuntary manslaughter instruction. *Id.*

at 330–31. He was convicted of second-degree murder. *Id* at 331.

The Eastern District, relying on *Beeler,* found error in the trial court's refusal to submit the involuntary manslaughter instruction to the jury. *Id.* at 333. The court held that "[t]he jury could have found that, in shooting [the victim], Defendant acted 'recklessly' as defined by Section 562.016.4 and *Beeler* . . . for involuntary manslaughter, rather than acting knowingly or 'with the purpose of causing serious physical injury' as required for the charged second degree murder offense." *Id.*

The State does not challenge the applicability of *Beeler* to this case, nor does it address whether the instruction should have been given based upon the evidence. Instead, it argues that there was no prejudice to Ms. Frost in the failure to instruct on involuntary manslaughter. The State asserts that because the jury found Ms. Frost guilty of second degree murder and declined to find her guilty of voluntary manslaughter, no reasonable basis exists to believe that the jury would have exercised even greater leniency and convicted her of involuntary manslaughter had that instruction been submitted.

In the State's claim that there was no prejudice to Ms. Frost, it relies on the fact that the Supreme Court of Missouri has consistently held that when a jury is presented with instructions on both first-degree and second-degree murder and it finds the defendant guilty of murder in the first degree, no prejudice results from a court's failure to give an instruction on an even lesser-included offense. *See State v. Hall,* 982 S.W.2d 675, 682 (Mo. banc 1998), *cert. denied,* 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999).[4] Rejecting the

---

4. *See also, State v. Barnett,* 980 S.W.2d 297, 305–06 (Mo. banc 1998); *State v. Jones,* 979 S.W.2d 171, 185 (Mo. banc 1998); *State v.*

defendant's claim that the trial court erred in failing to instruct on voluntary manslaughter, the Supreme Court in *State v. Jones*, 979 S.W.2d 171, 185 (Mo. banc 1998), *cert. denied*, 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999), explained the reasoning behind this rule:

> The jury, when presented with instructions on murder in the first degree and murder in the second degree, had the opportunity to find that [the defendant's] actions were not deliberate. Instead, the jury found the opposite. Thus, no reasonable basis exists to suggest that the jury would have reduced the conviction had they been presented with [the instruction] dealing with voluntary manslaughter.

The Court in *State v. Barnett*, 980 S.W.2d 297, 305 (Mo. banc 1998), addressed the same issue with respect to the failure to submit the lesser-included offenses of felony murder in the second degree and voluntary manslaughter. The Court stated that because the trial court's submission of "a conventional second degree murder instruction that sufficiently tested the jury's belief that [the defendant] had met all the elements for first degree murder[ ]" and the jury convicted on first-degree murder, there was no reasonable basis to believe the jury would have convicted on the excluded lesser-included offenses. *Id.* at 305–06.

This case can be distinguished from those cases in which courts have determined that prejudice did not exist since the instructions adequately tested the elements of the greater offense. In those cases, the lack of prejudice is apparent, since the conviction involved a determination of premeditation, which would have precluded conviction on any lesser offenses. Here, the jury was not instructed on first-degree murder, but was presented with instructions on second-degree murder, voluntary manslaughter and self-defense. Thus, this court must consider whether prejudice resulted in this particular case. In doing so, this court must determine whether the instructions sufficiently tested the elements of the greater offense. *See id.*

The second-degree murder instruction given by the trial court instructed the jury to find Ms. Frost guilty of second-degree murder if it found, beyond a reasonable doubt, that Ms. Frost caused Mr. Fingers' death by stabbing him; that she was aware that her conduct was practically certain to cause Mr. Fingers' death; that Ms. Frost did not do so under the influence of sudden passion arising from adequate cause, and that she did not act in lawful self-defense. The instruction further defined "sudden passion" as "passion directly caused by and arising out of provocation by Oscar Fingers which passion arose at the time of the offense." The instruction further defined "adequate cause" as "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." The instruction for voluntary manslaughter was similar to the instruction for second-degree murder, and instructed the jury to find Ms. Frost guilty of voluntary manslaughter if it found, beyond a reasonable doubt, that Ms. Frost caused Mr. Fingers' death by stabbing him; Ms. Frost was aware that her conduct was practically certain to cause Mr. Fingers' death; and Ms. Frost did not act in lawful self-defense.

When the court instructed on second-degree murder and voluntary manslaughter, it was, in essence, presenting the jury with the opportunity to determine whether

*Smith*, 944 S.W.2d 901, 918–19 (Mo. banc 1997).

the actions of Ms. Frost were committed under the influence of sudden passion arising from adequate cause. That is the only difference between the two instructions. Indeed, in *Redmond,* 937 S.W.2d at 208, the Supreme Court stated that "[t]he crime of voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused 'under the influence of sudden passion arising from adequate cause[.]'" (Quoting § 565.023). By convicting on second-degree murder, and not voluntary manslaughter, the jury determined that Ms. Frost did not cause Mr. Fingers' death under the influence of sudden passion arising from adequate cause.

In convicting Ms. Frost of second-degree murder, the jury also rejected Ms. Frost's claim of self-defense. The jury instruction on self-defense instructed the jury that if Ms. Frost "reasonably believed she was in imminent danger of forcible rape from the acts of Oscar Fingers and she reasonably believed that the use of deadly force was necessary to defend herself, then she acted in lawful self-defense."

Based upon the facts of this case, however, there was another alternative that was not foreclosed by the jury's finding that Ms. Frost purposefully caused Mr. Fingers' death, but did not do so under the influence of sudden passion arising from adequate cause, and did not act in lawful self-defense in doing so. The conduct of Ms. Frost could still have been consistent with a purposeful homicide, but committed with "an unreasonable belief that the conduct was necessary to save [her] own life." *See Beeler,* 12 S.W.3d at 298. "This cir-

cumstance is often referred to as 'imperfect self-defense.'" *Id.* The instruction on involuntary manslaughter submitted by the defense but refused by the trial court read as follows:

If you do not find the defendant guilty of voluntary manslaughter, you must consider whether she is guilty of involuntary manslaughter under this instruction.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about June 18, 1998, in the County of Jackson, State of Missouri, the defendant caused the death of Oscar Fingers by stabbing him, and

Second, that defendant recklessly caused the death of Oscar Fingers, then you will find the defendant guilty under Count I of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of involuntary manslaughter.

In determining whether the defendant recklessly caused the death of Oscar Fingers, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances.[5]

Under § 563.031.2, "[a] person may not use deadly force upon another person ... unless he reasonably believes that such deadly force is necessary to protect him-

---

5. The instruction offered by Ms. Frost does not comply exactly with MAI–CR 3d 313.10. The errors are minor, but should be corrected on retrial. Additionally, on retrial it should be considered whether the Supreme Court's

decision in *Beeler,* 12 S.W.3d at 301, requires modification of the involuntary manslaughter instruction when given with the second-degree murder and self-defense instructions.

self or another against death, serious physical injury, rape, sodomy or kidnapping or serious physical injury through robbery, burglary or arson." Had the instruction on involuntary manslaughter been given, the jury could have found that Ms. Frost was acting in self-defense, but determined that her belief that she needed to use deadly force was unreasonable in light of the circumstances.

Although the jury convicted Ms. Frost of the greater offense when presented with second-degree murder and voluntary manslaughter, a reasonable basis exists upon which the jury could have exercised greater leniency. Except that the second-degree murder instruction required that the jury find that Ms. Frost did not act under the influence of sudden passion, the instructions for second-degree murder and voluntary manslaughter were virtually identical. This court cannot say that the jury was adequately tested on the elements of second-degree murder to the extent that submission of involuntary manslaughter would have made no difference. Accordingly, Ms. Frost was prejudiced by the trial court's failure to give an instruction on involuntary manslaughter and her conviction of second-degree murder is reversed.

Reversal of Ms. Frost's conviction of murder in the second degree also requires reversal of her conviction of armed criminal action, since conviction of armed criminal action requires the commission of an underlying felony. *Redmond*, 937 S.W.2d at 210; § 571.015.1.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

All concur.