**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

STEVE LOREN SCOTT, a/k/a SCOTTIE,
        *Defendant-Appellant.*

No. 07-50020

D.C. No.
CR-02-00938-R-12

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
March 8, 2011—Pasadena, California

Filed June 8, 2011

Before: Pamela Ann Rymer, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Per Curiam Opinion

7521

## COUNSEL

Gretchen Fusilier, Carlsbad, California, for the defendant-appellant.

Anne M. Voigts, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

PER CURIAM:

Steve Loren Scott appeals his conviction and 220-month sentence after being found guilty by a jury of one count of Racketeer Influenced and Corrupt Organizations (RICO) conspiracy, 18 U.S.C. § 1962(d), for participating in violent acts undertaken by the Aryan Brotherhood prison gang. We affirm.

I

The Aryan Brotherhood (AB) is a violent prison gang that started in California prisons but eventually spread to the federal prison system. Its members, most of whom are white prisoners, engaged in a conspiracy to use violence and traffic drugs to maintain a position of power in prisons and to discipline other members. The gang operated under a "blood in / blood out" rule, meaning one had to spill blood to become a member and only left the AB when dead. The federal AB was run by a three-man commission. A council, which had authority over day-to-day operations of a particular prison, reported to the commission.

Scott was a prospective AB member in 1992 while imprisoned at Leavenworth federal penitentiary. He allegedly became a member after stabbing Ismael Benitez-Mendez, who had attacked another AB member. Several years later, the AB, including Scott, entered into a violent and deadly war with the D.C. Blacks, another federal prison gang comprised of mostly black inmates. The catalyst for the war was the attack on an elderly white inmate at Marion prison around 1996 by Walter Johnson ("Butch" or "Prince"), a member of the D.C. Blacks. Soon thereafter, the AB commission, through commissioner T.D. Bingham, sent a letter to members at the Lewisburg prison declaring war. As a result, two inmates at Lewisburg, who were members of the D.C. Blacks, were killed by the

AB. Around that time, Scott was appointed to head the business department of the AB.

As the war raged between the two prison gangs, Scott discussed with other members how to make and store weapons and passed around a "hit list" of D.C Black members to attack. He was also promoted and became a member of the AB council. In 2000, during the ongoing war, Scott stabbed Erving Bond, a black inmate, in the shower.

Six years later, Scott went to trial on the second count of the indictment for conspiring to conduct the affairs of the AB through a pattern of racketeering activity, including the overt acts of murder and drug trafficking. At the start of trial, the prospective jurors were asked to fill out a questionnaire jointly prepared by the parties and during voir dire were asked questions by the district court. The court excused jurors who indicated they could not conscientiously perform their duty to decide the case impartially, had heard anything during opening statements or the indictment that meant they could not be impartial, or believed the case had to do with racism.

The court then gave preliminary jury instructions. Among other things, it cautioned the jurors:

> During the course of the trial, I may occasionally ask questions of a witness in order to bring out facts which may not be fully covered by the testimony. You are not to consider my questioning of the witness, even if it may become lengthy, as an indication of what I feel about the case in general or the testimony of that witness in particular. If I should make any comments on the evidence, as the law permits me to do, you may disregard any comment of mine on facts in arriving at your own finding as to the facts.

The court also explained that it might "admonish a lawyer who out of zeal for the cause does something which is not in

keeping with the rules of evidence or procedure. You are not to draw any inference against a side to whom an admonition of mine may be addressed during the trial in this case." It further asked the jurors not to take notes but instead "to give your closest attention to the testimony and evidence of each witness so that you can contribute your individual judgment to your deliberations."

The trial lasted about seven days. On the morning of closing arguments, the court gave the parties its proposed instructions. Scott's counsel objected to having had only nine minutes to review them and also objected to the exclusion of proposed instructions on defenses to murder. The court denied Scott's objections regarding the defenses to murder, finding there was no evidence to support those defenses. It then read the instructions to the jury, including once again informing the jurors they should not infer anything from the court's questions, admonitions to counsel, or evidentiary rulings.

During deliberations, the jury asked for an index of the exhibits, a copy of the jury instructions, and the testimony of witnesses Jimmy Lee Inman and Agent Michael Halualani. The following morning, Inman's testimony was read back but Halualani's was not, because it was unavailable. Soon thereafter, the jury returned its verdict, finding that Scott conspired to murder Walter Johnson ("Butch" or "Prince") and two unnamed D.C. Black inmates.

The Pre-Sentence Report (PSR) calculated a base offense level of 28 based on the RICO predicate offense of conspiracy to murder, added three points pursuant to grouping rules due to Scott's conviction for three murders, and added one point for a "crime of violence" enhancement. The PSR calculated a total criminal history of 18 points, which included a prior conviction for assaulting Erving Bond. That placed Scott in criminal history category VI. Because he was deemed a career offender, his criminal history category would have been VI anyway. The Guidelines range was 210-240 months due to

RICO's statutory maximum of twenty years. The district court rejected Scott's objections to the PSR, noting that they merely reargued the merits of the case and adopted the PSR. Scott was sentenced to 220 months in prison.

Scott timely appealed the conviction and sentence.

II

Scott seeks to overturn the jury's verdict because the district court abused its discretion in limiting voir dire and cross-examination, in prohibiting juror note-taking, in refusing certain jury instructions, and in failing to make a preliminary determination on the admissibility of co-conspirator statements. Scott also claims that the judge engaged in misconduct through his interruptions and demeaning remarks aimed at defense counsel.[1]

A

[1] The district court conducted the voir dire based on a questionnaire previously completed by prospective jurors and through additional follow-up questions as it saw necessary. Scott now argues the district court abused its discretion in refusing to ask certain additional questions proposed by him that probed for juror bias regarding race. We will not disturb a district court's rejection of a defendant's specific questions unless the voir dire it conducts is "so unreasonable or devoid of the constitutional purpose as to constitute an abuse of [ ] discretion." *Haslam v. United States*, 431 F.2d 362, 364 (9th Cir. 1970); *see also United States v. Giese*, 597 F.2d 1170,

---

[1]Scott also asks us to strike several statements in the Statement of Facts in the government's brief for being unsupported by references to the record, as required by Federal Rule of Appellate Procedure 28, because they only refer to the PSR or the indictment. Rule 28 merely requires a statement of facts to contain "appropriate references to the record," and both the PSR and indictment are part of the record on appeal. Fed. R. App. P. 28(a)(7), (b). No portion of the government's brief need be stricken.

1181-83 (9th Cir. 1979). In the questionnaire and during voir dire, the prospective jurors were asked about racial biases and whether they felt they could not be impartial. The questions Scott proposed were either repetitive of these questions or could have added "fuel to the flames" in suggesting the presence of controversial issues. *See Giese*, 597 F.2d at 1183. We are satisfied that the district court here properly exercised its discretion.

B

Scott notes that on four occasions the district court refused to let defense counsel ask questions on cross-examination that pertained to the role of race in prisons, which was especially harmful because the jury's verdict was undisputedly based on its finding that Scott harbored racial animus against blacks. He claims the court abused its discretion in so limiting cross-examination and, accordingly, violated his rights under the Confrontation Clause of the Sixth Amendment and his due process right to present his defense.

[2] On most occasions, Scott was able to elicit testimony from the witness regarding racial segregation in prison. The questions that the district court prevented defense counsel from asking were simply repetitive or far afield of the issues in the case. *See United States v. Brown*, 936 F.2d 1042, 1048-49 (9th Cir. 1991). On another occasion, defense counsel's questions on race were outside the scope of any testimony on direct examination. We have previously noted that the district court "is responsible for determining the relevance of a given topic and the extent of cross-examination to be permitted on that topic." *Id.* at 1048. In prohibiting such questioning on a few occasions, the district court did not abuse its discretion. *See United States v. Vargas*, 933 F.2d 701, 704 (9th Cir. 1991).

C

[3] Scott next challenges the district court's decision to prohibit juror note-taking. We have previously observed that

"[w]hether it is advisable to permit a jury to take notes is a subject of some debate, and reasonable arguments are advanced for and against the practice. The decision of whether to allow the jury to take notes is left entirely to the discretion of the trial court." *United States v. Baker*, 10 F.3d 1374, 1403 (9th Cir. 1993) (internal quotation marks omitted), *overruled on other grounds by United States v. Norby*, 225 F.3d 1053 (9th Cir. 2000). We articulated a number of reasons for prohibiting note-taking, "including concerns that jurors would be distracted from observing witnesses, would record the evidence selectively, or would rely on their own or other jurors' inaccurate notes." *Id*. The district court here articulated similar concerns in prohibiting note-taking.

Scott responds that his trial was especially complex or lengthy. In support of this contention, he points to the jury requests for an index of exhibits and read-backs of certain testimony. This argument is unpersuasive. *Baker*, in which we held that the district court did not abuse its discretion in declining to allow juror notetaking, *id.*, involved "one of the lengthiest and costliest trials in this nation's history"—it "lasted over 16 months, produced over 30,000 pages of transcripts, and involved more than 250 witnesses," *id.* at 1386. Scott's trial lasted less than seven days.

Nor did the jury's inability to take notes result in a coerced verdict, thus violating Scott's due process right to full and fair deliberation. There is no evidence that the jury's verdict was coerced. The jury deliberated for two days and convicted Scott on only three of the eight charged overt acts. Scott points to nothing in the record indicating that the jury was ever deadlocked on the overt acts for which he was convicted, or that the district court employed any coercive means to break any deadlocks. *See Harrison v. Gillespie*, ___ F.3d ___, 2011 WL 546585, at *9-11 (9th Cir. Feb. 15, 2011) (en banc).

**[4]** The district court has very broad discretion in deciding whether to allow note-taking, and it properly exercised that discretion here.

D

**[5]** Scott also contends that the district court erred in refusing to instruct the jury on his asserted defenses of mutual combat and imperfect self-defense. Because Scott did not request a mutual combat instruction in his amended proposed instructions, nor object that the district court did not include the instruction, we review for plain error. *United States v. Bear*, 439 F.3d 565, 568-69 (9th Cir. 2006). Scott did not present or rely upon the mutual combat theory at trial and, thus, there was no error in the district court's failure to give the instruction sua sponte, much less plain error. *Id.*

**[6]** As to the imperfect self-defense instruction, there was also no evidence in the record to support such an instruction. *See United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir. 1985). Scott asserted this defense in relation to his stabbing of Erving Bond in the shower. For the racketeering activity of stabbing Bond, Scott was charged under Missouri criminal law, because the stabbing occurred in Missouri. Under Missouri law, this defense requires that Scott believed harm was imminent. *See* Mo. Rev. Stat. § 563.031.1 (defining self-defense as using force against another in the reasonable belief of defending against the imminent use of unlawful force by another); *State v. Frost*, 49 S.W.3d 212, 220-21 (Mo. Ct. App. 2001) (noting that imperfect self-defense is merely self-defense where defendant had an unreasonable belief that the use of deadly force was necessary to protect himself or another from serious harm).

The only evidence that Scott presented to suggest that he held such a view is Scott Cupples's hearsay testimony that Scott heard Bond sharpening a knife. Even accepting the truth of this testimony would not render the harm imminent. *See State v. Young*, 510 S.W.2d 732, 734-35 (Mo. Ct. App. 1974) (no evidence of imminence where the deceased had hit the defendant and threatened him two days prior to the shooting; the defendant knew that the deceased's reputation was that of

a killer; the defendant saw the deceased on the morning of the incident at which time the deceased threatened "to get" him that day; and the defendant met the deceased while walking to his car).

Similarly, Scott argues the district court violated Federal Rule of Criminal Procedure 30(b) by failing to provide his attorney with the jury instructions earlier, thus preventing his attorney from intelligently formulating her closing argument. Even assuming the district court failed to comply with Rule 30(b), Scott has not shown that his counsel's closing arguments were prejudicially affected. *See United States v. Gaskins*, 849 F.2d 454, 458 (9th Cir. 1988). Scott fails to suggest any way in which his closing argument would have been different if the court had provided the instructions earlier. In any event, we have held a defendant was not prejudiced in more egregious cases. *See, e.g*, *United States v. McCown*, 711 F.2d 1441, 1452 (9th Cir. 1983); *United States v. Wycoff*, 545 F.2d 679, 683 (9th Cir. 1976). Therefore, regardless of any error, Scott has not shown prejudice.

### E

As part of the government's case-in-chief, several former AB members testified about Scott's participation in the gang. After several had testified, the district court instructed the jury that it first must determine whether a conspiracy existed before considering the statements of the co-conspirators.[2] The court's instruction indicates, according to Scott, that the district court erroneously delegated to the jury the task of determining the admissibility of co-conspirator statements.

---

[2]The court's instruction stated, in part, "But once you have made the determination from the evidence that a conspiracy existed and who the members are, you can then, and only then, use all of the statements made by an alleged co-conspirator against any of those persons you find to also have been conspirators."

**[7]** It has been long-established that a judge must make the initial determination about the existence of a conspiracy that would allow for the admission of co-conspirator statements. *See United States v. King*, 552 F.2d 833, 848 (9th Cir. 1976); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987); Fed. R. Evid. 104(a). However, we are satisfied from reading the record that the district court understood it was required to make the initial determination about the existence of a conspiracy that would allow for the admission of co-conspirator statements. *See King*, 552 F.2d at 848. For example, in ruling on Scott's motion *in limine* to exclude the co-conspirator statements, the court stated: "Well, again the question is during the trial as to whether or not these statements with reference to the conspiracy and *I can't make that determination* until I hear the evidence of conspiracy and then instruct the jury, as I often do, as to how they are to treat statements of other members of the conspiracy with reference to the conspiracy itself." Furthermore, we may assume the district court found a prima facie case of conspiracy where it submits, as it did here, the conspiracy case to the jury. *See United States v. Federico*, 658 F.2d 1337, 1343 n.6 (9th Cir. 1981) (citing *Giese*, 597 F.2d at 1198), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).

**[8]** Finally, the district court's instruction was not erroneous, for it merely provided the defendant with unnecessary double protection. *See id.*; *see also United States v. Lutz*, 621 F.2d 940, 946 & n.2 (9th Cir. 1980), *abrogated in part by Bourjaily*, 483 U.S. at 181; *United States v. Peralta*, 941 F.2d 1003, 1008 (9th Cir. 1991).

F

**[9]** Scott seeks to overturn his conviction on the ground that the trial judge committed misconduct by interrupting and directing derogatory comments at defense counsel. We will reverse a trial court for excessive judicial intervention only in

cases of actual bias, which Scott does not allege, or if "the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality," and the alleged misconduct had a prejudicial effect on the trial. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir. 1986) (internal quotation marks and citation omitted). "Before a jury's verdict will be overturned because of the conduct of a trial judge in rebuking or punishing an attorney or otherwise intervening in the proceedings, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." *United States v. Bennett*, 702 F.2d 833, 836 (9th Cir. 1983) (internal quotation marks omitted). "The assessment is to be made, moreover, in light of the evidence of guilt." *Id.*

**[10]** Here the trial transcript indicates that the district judge interrupted and admonished defense counsel over a hundred times during the course of a week-long trial. At times, the judge suggested that the defense counsel knew that she was acting improperly or was "smirk[ing]." The district court judge also criticized defense counsel for failing to "give th[e] jury [ ] credit for brains," failing to treat jurors as though they could "count" and "read," and deliberately wasting the jury's time. In several instances the trial judge also engaged in extensive questioning of both defense and government witnesses.

**[11]** Although many of the judge's comments and interventions were inconsistent with standards of judicial decorum, we nevertheless conclude that they did not rise to a level that requires reversal. First, the record indicates that the majority of the district court's comments to defense counsel were pursuant to the court's supervisory role, in that they were aimed at stopping defense counsel from engaging in irrelevant, repetitive, or otherwise improper questioning or editorializing. Insofar as the judge's rebukes pertained to this kind of conduct, they were within his discretion to ensure the orderly and efficient presentation of evidence and to control the pace of

trial. *Shad*, 799 F.2d at 531. Neither did the trial judge's questioning of witnesses exceed the bounds of propriety. A district judge has the undeniable authority to examine witnesses and call the jury's attention to important evidence. *Id.* Even in cases where a district judge's "questioning was not marked by complete indifference [and instead sometimes was] quite pointed and intemperate," reversal was not required. *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1990) (as amended), *overruled on other grounds by Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Here, although the judge's questioning was pointed, it was generally for the purpose of "clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986). Moreover, because the trial judge's questioning comprised less than 20 pages of a 1291-page trial transcript, it did not preempt counsel's examination. *See Kennedy*, 901 F.2d at 709 (concluding that when a trial judge's questioning filled only eight pages of a 400-page trial transcript, the "court [did not] dominate questioning of the witnesses so as to preempt counsel's function").

**[12]** Most important, the district court judge gave a series of curative instructions to the jury regarding the conduct at issue here. The judge stated that his questioning of witnesses should not be taken as an indication of how he felt about the case in general or the testimony of any witnesses. He further explained that he might "admonish a lawyer who out of zeal for the cause does something which is not in keeping with the Rules of Evidence or procedure," but that the jury should "not [ ] draw any inference against a side to whom an admonition of mine may be addressed." The judge also instructed the jury that "trial cannot be treated as a popularity contest nor should it be used to measure or compare the skill or cleverness of the lawyers involved." Juries are presumed to follow jury instructions, *Brown v. Ornoski*, 503 F.3d 1006, 1018 (9th Cir. 2007), and such instructions can "alleviat[e] any appearance of

impartiality the judge's questioning may have conveyed," *Kennedy*, 901 F.2d at 710.

**[13]** In light of the district court judge's extensive curative instructions, the strength of the evidence of Scott's guilt on the offenses for which he was convicted, and the jury's independence in rejecting five of the alleged predicate acts, we conclude that Scott was not prejudiced by any improper conduct on the judge's part, either individually or in the aggregate. *See United States v. Morgan*, 376 F.3d 1002, 1009 (9th Cir. 2004) (holding that the trial judge's misconduct at trial did not prejudice the defendant in light of the court's curative instructions); *see also United States v. McDonald*, 576 F.2d 1350, 1358 (9th Cir. 1978) (noting that while charges of judicial misconduct are not "dismissed lightly," and although a few of the judge's remarks were "sharp, even sarcastic," they did not warrant a new trial).

## III

Scott also appeals his sentence, arguing the district court violated his Sixth Amendment rights by increasing his sentence based on acquitted overt acts, erroneously found his offense was a "crime of violence," applied the incorrect base offense level, and failed adequately to articulate the reasonableness of the sentence.

## A

**[14]** Scott argues the district court violated his Sixth Amendment rights by increasing his sentence under the Guidelines for overt acts for which he was not convicted. Nothing in the record indicates the district court relied on such overt acts at sentencing. Regardless, Scott's Sixth Amendment right could not have been violated because his sentence was lower than the statutory maximum authorized for crimes for which he was convicted—240 months under RICO. *See United States v. Mercado*, 474 F.3d 654, 657 (9th

Cir. 2007) ("[T]he constitutional propriety of a sentencing court's consideration of conduct which underlay an acquitted charge existed before creation of the Guidelines and continues to exist today.").

**[15]** Scott attempts to distinguish *Mercado* by arguing that the overt acts were part of one count—Count Two—on which Scott went to trial. That is, while a court may consider acquitted *counts* under *Mercado*, all the overt acts here were part of one count. *Mercado*, however, agreed "with the proposition that the use of *acquitted conduct* at sentencing does not violate the Constitution." *See id.* (emphasis added). Therefore, the district court's alleged use of acquitted conduct did not violate the Constitution.

B

**[16]** The district court here looked behind the RICO conviction and considered the underlying predicate offenses in determining whether Scott's offense qualified as a crime of violence. It was proper for the court to do so. Application Note 2 to U.S.S.G. § 4B1.2 requires that the focus of the inquiry in making a "crime of violence" determination be on the *conduct* for which Scott was convicted. *See United States v. Winter*, 22 F.3d 15, 19 (1st Cir. 1994) (RICO conviction will qualify as career offender predicate offense if the activities encompassed pose a serious potential risk of violence); *see also United States v. Juvenile Male*, 118 F.3d 1344, 1350 (9th Cir. 1997) (RICO conspiracy to commit Hobbs Act robberies is a crime of violence under Juvenile Delinquency Act). The jury's verdict makes clear that Scott's conviction was for conspiracy to murder, which falls squarely within the definition of "crime of violence." *See* U.S.S.G. § 4B1.2(a) & cmt. n.1 (noting "crime of violence" includes conspiracy to murder).

Scott nevertheless argues that the district court's characterization of his crime as a "crime of violence" violated his Sixth

Amendment right because there was no opportunity for the jury to consider it. As we explained above, no Sixth Amendment rights were violated because Scott was sentenced within the statutory maximum.

Scott contends that the court's determination also violated his Fifth Amendment right to due process because there was no opportunity to defend against the finding at trial, and the district court never indicated the standard of proof employed for the finding. We have previously rejected this argument, noting that the "crime of violence" determination is a legal, not factual, one. *See United States v. Brown*, 417 F.3d 1077, 1079-80 (9th Cir. 2005).

Scott is correct that the district court merely adopted the PSR's "crime of violence" determination. This was sufficient. *See United States v. Tam*, 240 F.3d 797, 803-04 (9th Cir. 2001) (if the district court adopts the PSR, this court treats it as the district court's findings).

C

The district court applied a base offense level of 28, pursuant to U.S.S.G. §§ 2E1.1 and 2A1.5. Section 2E1.1, which covers RICO conspiracies, requires courts to apply the greater of 19 and the offense level applicable to the underlying racketeering activity. Scott was convicted of the underlying racketeering activity of conspiracy to murder three persons. Section 2A1.5 governs conspiracy to commit murder, and sets a base offense level of 28, which the district court properly used.

[17] Scott responds that the base level of 19 should apply because he was convicted under state law but the jury did not state whether it convicted him under Colorado, Missouri, Illinois, or Kansas conspiracy statutes. That is, because the underlying state statute is unclear, the second option under § 2E1.1 should not be available. Application Note 2 to § 2E1.1 states: "If the underlying conduct violates state law,

the offense level corresponding to the most analogous federal offense is to be used." There is no indication that a prerequisite is determining which state law was violated. The special verdict form indicates the jury found him guilty of conspiring to murder under state law, so the district court properly analogized to the federal offense of conspiracy to murder.

D

Lastly, Scott challenges his sentence by arguing that the district court failed to articulate the reasonableness of its sentence, as required by 18 U.S.C. § 3553(a), and failed to give a statement of reasons for its sentence, as required by 18 U.S.C. § 3553(c). Where, as here, the district court decides simply to apply the Guidelines, doing so usually will not require lengthy explanation. *Rita v. United States*, 551 U.S. 338, 356 (2007); *United States v. Carty*, 520 F.3d 984, 992-93 (9th Cir. 2008) (en banc). The sentencing court's responsibility is to address specific arguments tethered to § 3553(a) raised by the defendant. *Carty*, 520 F.3d at 992. Scott raised several challenges in his sentencing memorandum, and the district court rejected many of them by properly noting that they were merely "rearguing the matter of the case." As to the other arguments, we are satisfied by the record as a whole that the district court in adopting the PSR considered them and simply found them unpersuasive. *See United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1054 (9th Cir. 2009); *Tam*, 240 F.3d at 803-04.

**[18]** With respect to a statement of reasons under § 3553(c), we have held that a "within-Guidelines sentence ordinarily needs little explanation unless a party has requested a specific departure, argued that a different sentence is otherwise warranted, or challenged the Guidelines calculation itself as contrary to § 3553(a)." *Carty*, 520 F.3d at 992. Scott was sentenced within a properly calculated Guidelines range; the PSR explained in great detail the calculations and responses to objections; and Scott did not argue for a sentence outside

the Guidelines. No detailed explanation by the district court was necessary.

**AFFIRMED.**