**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ROBERT DAVID KAHRE, AKA Robert
D. Kahre,
*Defendant-Appellant*.

No. 09-10471

D.C. No.
2:05-cr-00121-
DAE-RJJ-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

LORI A. KAHRE, AKA Donna Hall,
*Defendant-Appellant*.

No. 09-10528

D.C. No.
2:05-cr-00121-
DAE-RJJ-11

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ALEXANDER C. LOGLIA,
*Defendant-Appellant*.

No. 09-10529

D.C. No.
2:05-cr-00121-
DAE-RJJ-12

OPINION

Appeal from the United States District Court
for the District of Nevada
David A. Ezra, District Judge, Presiding

Argued and Submitted
June 11, 2012—San Francisco, California

Filed December 5, 2013

Before:  Proctor Hug, Jr., Johnnie B. Rawlinson,
and Sandra S. Ikuta, Circuit Judges.

Per Curiam Opinion

# SUMMARY[*]

## Criminal Law

The panel affirmed three defendants' convictions and one defendant's sentence for criminal tax offenses arising from their use of gold and silver coins to pay wages and thus avoid the reporting of payroll and income taxes.

Rejecting the defendants' contention that dismissal of the indictments was warranted, the panel held that the defendants had sufficient notice of the illegality of relying on the face value of coins to avoid paying taxes.

The panel held that the district court did not abuse its discretion in denying the defendants' motions to disqualify the prosecutor due to his status as a defendant in a *Bivens* lawsuit filed by defendants Robert and Lori Kahre. The panel held that the defendants failed to present clear and convincing evidence of a conflict.

The panel held that the district court properly denied as moot Robert's initial motion to suppress because none of the seized evidence was introduced at trial. The panel held alternatively that Robert's arrest and the corresponding search were legally conducted pursuant to a state bench warrant. The panel held that the district court correctly denied Robert's subsequent suppression motion because the warrants incorporated the accompanying affidavit, which possessed the requisite specificity limiting the agents' discretion.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in excluding evidence challenging the legal import of its ruling that gold and silver coins used to pay wages were to be assessed at fair market value for tax purposes. The panel held that the district court correctly recognized that the coins were taxable as property based on their fair market value.

The panel held that the district court did not commit reversible error in excluding testimony of the defendants' contemporaneous statements concerning their tax theories. The panel explained that in each instance the exclusion was neither an abuse of discretion nor prejudicial, and held that the district court acted within its discretion when it excluded, as irrelevant and prejudicial, evidence of the federal agents' use of force during execution of the search warrants. The panel held that the district court did not engage in any misconduct warranting a new trial.

The panel held that the district court's calculation of Robert's tax liability at sentencing and the corresponding restitution amount was supported by the evidence presented at trial and the jury's findings, that an enhancement for obstruction of justice and the denial of a downward adjustment for acceptance of responsibility were consistent with the historical record, and that Robert's below-guidelines sentence was reasonable and was not disproportionately severe.

## COUNSEL

Michael K. Powell and Michael J. Kennedy (argued), Assistant Federal Public Defenders, Reno, Nevada, for Appellant Lori A. Kahre.

Lisa A. Rasmussen, Las Vegas, Nevada, for Appellant Robert D. Kahre.

Joel F. Hansen, Hansen Rasmussen, Las Vegas, Nevada, for Appellant Alexander C. Loglia.

Gregory Victor Davis, Mark S. Determan (argued), Department of Justice, Washington, D.C., for Appellee United States.

## OPINION

PER CURIAM:

Appellants Robert Kahre (Kahre), Lori Kahre (Lori) and Alexander Loglia (Loglia) challenge their convictions for various criminal tax offenses arising from their use of gold and silver coins to pay wages and thus avoid the reporting of payroll and income taxes. Appellants contend that dismissal of the indictments was warranted because Appellants lacked the requisite notice that their conduct violated applicable tax laws. Appellants also assert that a new trial was in order because the prosecutor should have been disqualified due to his status as a defendant in a *Bivens*[1] lawsuit filed by the

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Kahres, and because the district court's prejudicial conduct and erroneous evidentiary rulings deprived them of a fair trial. In addition, Robert Kahre challenges the district court's denial of his motions to suppress and the sentence imposed. We affirm Appellants' convictions and Kahre's sentence.

## I.  BACKGROUND

### A.  Third Superseding Indictment (Indictment)[2]

The Indictment alleged that Appellants engaged in a conspiracy to avoid the payment of payroll and income taxes by utilizing a payroll system pursuant to which employees received their wages in gold and silver coins, which were later exchanged for cash. According to the Indictment, "the face amount of the coins was one-eighth of the amount of pay that the employee actually earned and received in the envelope of cash[.]" The Indictment alleged that Appellants failed to withhold the required federal income taxes, medicaid taxes, and social security taxes from the employees' wages, and that Appellants created false invoices to conceal the payroll expenses. The Indictment also alleged that Kahre marketed the payroll service to other contractors and charged an administrative fee for use of the payroll service.

The Indictment charged all three defendants with one count of conspiracy in violation of 18 U.S.C. § 371, and one count of attempting to interfere with the administration of internal revenue laws in violation of 26 U.S.C. § 7212(a). Robert and Lori Kahre were charged with an additional count

---

[2] The Third Superseding Indictment was the indictment in effect at the time of trial at issue in this appeal.

of attempting to interfere with the administration of internal revenue laws in violation of 26 U.S.C. § 7212(a).

The Indictment charged Robert Kahre with forty-eight counts of failure to pay employment taxes in violation of 26 U.S.C. § 7202; four counts of attempting to evade or defeat taxes in violation of 26 U.S.C. § 7201; and one count of wire fraud in violation of 18 U.S.C. § 1343.

The Indictment charged Lori Kahre with one count of making false statements to a bank in violation of 18 U.S.C. § 1014, and eight counts of attempting to evade or defeat taxes in violation of 26 U.S.C. § 7201.

Finally, the Indictment charged Loglia with one count of filing false income tax returns in violation of 26 U.S.C. § 7206(1), and ten counts of attempting to evade or defeat taxes in violation of 26 U.S.C. § 7201.

## B.  Pretrial Motions

### 1.  *Kahre's Motions To Suppress*

In his search warrant affidavit, Internal Revenue Service (IRS) Special Agent Jared Halper observed that, although Kahre's businesses were generating significant revenues, Kahre had not filed business tax returns or employment taxes since the early 1990s.  Kahre also had not filed individual tax returns since 1991.

Agent Halper averred that Kahre leased employees to various contractors, and withdrew cash from Bank of the West for the payroll.  According to Agent Halper, Kahre withdrew $24,096,012 in cash between January 17, 2002, and

October 31, 2002.  Kahre's employees collected their wages at a warehouse located at 6270 Kimberly Avenue in Las Vegas.  The employees received nominal amounts of gold certificates or gold chips, which they immediately exchanged for envelopes of cash.  Kahre allegedly withheld "sixty percent of the employees' payroll. . . ."

Based on Kahre's conduct, Agent Halper stated that there was probable cause to believe that Kahre was engaged in a conspiracy to evade taxes and to interfere with the administration of the tax laws by the IRS.  Agent Halper's affidavit reflected that evidence of Kahre's criminal activities could be found at the 6270 Kimberly Avenue, 6295 Grand Canyon, and 1555 Bledsoe Lane addresses (The Kimberly, Grand Canyon, and Bledsoe properties).

In his declaration, Agent Halper related that IRS agents reviewed the search warrant affidavit prior to the searches. Kahre was subsequently arrested at Bank of the West pursuant to a state bench warrant for failure to appear, and the agents seized $230,913 in cash, which was provided to the IRS to satisfy Kahre's "unpaid federal income tax liabilities." According to Agent Halper, Kahre had unpaid tax assessments of approximately $2,000,000.

The district court ruled that Kahre's motion to suppress evidence seized when Kahre was arrested at Bank of the West was moot because the seized evidence would not be used at trial.  The district court also determined that the government was not required to return the cash seized from Kahre because it was used to offset Kahre's tax liabilities.

The district court granted in part and denied in part Kahre's amended motions to suppress evidence seized from

the Kimberly, Bledsoe, and Grand Canyon properties. Because Kahre was not present during the execution of the search warrants, the district court held that Kahre lacked standing to challenge the manner in which the search warrants were executed. The district court concluded that, because the search warrant properly incorporated the search warrant affidavit, the warrant was not overly broad. The district court also held that the agents properly seized gold and silver coins relating to Kahre's payroll scheme. However, the district court granted Kahre's motion to suppress information and documents that were unrelated to the time periods specified in the warrants.

## 2. *Appellants' Motions To Disqualify the Prosecutor For Conflict of Interest*

On October 30, 2003, several plaintiffs, including the Kahres, filed a *Bivens* action against the federal prosecutor, as well as other federal defendants. The complaint alleged, *inter alia*, that the federal defendants orchestrated an illegal raid of Kahre's properties, improperly arrested Kahre and stole $230,913 in cash from him.

On October 4, 2004, the district court in the *Bivens* action denied the prosecutor's motion to dismiss premised on absolute immunity. Treating the complaint's allegations as true, the court denied absolute immunity because of the prosecutor's alleged involvement in planning the raids.

The government subsequently filed two indictments against Appellants, and the district court in the *Bivens* case granted the government's emergency motion to stay the proceedings based on the pending criminal prosecutions. During the first trial, the jury was unable to reach verdicts,

and the government subsequently filed the Third Superseding Indictment.

Prior to the second trial, Kahre renewed a prior motion to disqualify the prosecutor because of a conflict of interest. In an attached declaration, Kahre's counsel related that the prosecutor had remarked that Kahre's counsel had "threatened [his] job and [his] pension," making the case "personal." Kahre filed a subsequent motion to disqualify the prosecutor because of his pecuniary and emotional interests in the *Bivens* action, and because the prosecutor had filed the indictments as retaliation for being named in the *Bivens* action.

The district court denied Kahre's motion, ruling that automatic disqualification was not warranted due to the pendency of a *Bivens* action, and that the prosecutor's comments did not require disqualification on the merits.

### 3. *Appellants' Motions To Dismiss the Indictments Based on the Gold and Silver Coins' Valuation*

Appellants asserted that they lacked the requisite notice that their payroll payments in gold and silver coins were taxable at the coins' fair market value and that their conduct violated the tax laws. They contended that the lack of notice in the statutory language compelled application of the rule of lenity, resulting in a construction of the statute that was most favorable to them. The district court rejected the Appellants' argument, explaining that the applicable statutes were unambiguous regarding the elements of conspiracy to defraud the government and of willful failure to truthfully account for taxes owed. The district court added that the statutes' scienter requirements mitigated any vagueness and that the

tax provisions patently articulated reporting and filing requirements.

The district court eschewed Appellants' argument that they did not defraud the government because gold and silver coins used to pay employees should have been assessed at face value, rather than fair market value, for tax purposes. If, for example, an employee was paid with ten silver dollar coins, Appellants would argue that the employee received only ten dollars in wages. However, if each silver dollar had a fair market value of fifty dollars, the government assessed the wages at 10 x $50 or $500.00. The district court was persuaded that Ninth Circuit precedent, as well as that of other courts including the Tax Court, required taxation of the coins at fair market value. The district court observed that the tax code and corresponding Treasury regulations treated property, such as gold and silver coins used as compensation for services rendered, as taxable at fair market value.

### C. Trial Testimony and Verdicts

George Rodriguez (Rodriguez), who pled guilty to tax evasion, served as a foreman and superintendent for Kahre's business, Wright Painting and Drywall. According to Rodriguez, all employees were required to sign an independent contract agreement in order to receive their pay. The agreement was designed to shield Kahre and his employees from tax obligations by establishing a system of wage payments in gold and silver.

Although Kahre told Rodriguez that he was an independent contractor, Rodriguez described himself as an employee of Robert Kahre's business. Kahre had the authority to direct Rodriguez in the performance of Kahre's

duties, including what work to perform and when the work was to be performed. Kahre also instructed Rodriguez regarding the timing of hiring additional workers, and regarding where to purchase supplies and tools. Kahre also had the right to terminate Rodriguez's employment.

According to Rodriguez, he and the other employees were paid in gold and silver on a weekly basis based on a system developed by Kahre and administered by Lori. Each week, Rodriguez received a single gold coin which he immediately exchanged for an envelope containing his $500 weekly salary in cash. All employees were required to accept payment in gold or silver coins, which coins were later exchanged for cash. Rodriguez never received W-2 forms reflecting his wages, and no deductions were made from his wages for income tax purposes.

Rodriguez obtained tubes of gold and silver which he exchanged for envelopes of cash to distribute to the other employees. Rodriguez confirmed payroll payments after consulting payroll sheets generated by Lori. Payrolls were met with cash payments, and Rodriguez did not recall any employee who actually retained the gold or silver coins as wage payments.

Heidi Molesworth (Molesworth), who pled guilty to tax evasion, was employed in Kahre's payroll office for five years. Kahre informed Molesworth that she was an independent contractor and she signed an independent contractor agreement. Nevertheless, Kahre paid Molesworth's wages in gold and silver coins that she immediately exchanged for envelopes of cash. Molesworth

did not receive W-2 or 1099 forms,[3] and never filed a tax return. Molesworth paid Kahre's employees in gold and silver coins. If an employee retained the gold or silver coins, the coins' fair market value was deducted from the cash wages due.

Molesworth testified that she and Lori used false names on the payroll sheets to avoid having to pay taxes, and that it was standard procedure to use false names on employment verification forms. Although most other employees were paid using the gold and silver exchange, Molesworth and the Kahres did not use that system for payment of their own wages. Instead, envelopes of cash were prepared for payment of their wages. Robert Kahre received fees for administering the payrolls of other companies, for which he used the same coin/cash payment system he utilized for his employees.

IRS Special Agent Ryan Rickey testified that, between 1999 and 2003, Kahre's companies paid $22,382,760.42 in wages. Between 1998 and 2003, the companies using Kahre to administer their payrolls paid a total of $95,042,952.14 in wages and Kahre received $14,100,087.10 in fees. Agent Rickey also testified that return filing histories reflected that Kahre did not file any tax returns between 1991 and 2006;

---

[3] A W-2 form is "[t]he form that an employer must send to an employee and the IRS at the end of the year. The W-2 form reports an employee's annual wages and the amount of taxes withheld from his or her paycheck." http://www.investopedia.com/terms/w/w2form.asp (last visited May 29, 2013).

A 1099 form is "[t]he IRS form for reporting payments to independent contractors or interest earned on investments or bank accounts . . ." http://financial-dictionary.thefreedictionary.com/Form+ 1099 (last visited May 29, 2013).

Lori filed false returns from 1996 to 1999, and did not file any returns between 2000 and 2006; and Loglia did not file returns from 1998 to 2006.

IRS Revenue Agent Sue Cutler estimated that, between 1999 and 2002, Kahre's companies paid Kahre a total salary of $1,956,738, and Kahre earned $14,100,087.10 in fees from other companies using his payroll services. Agent Cutler surmised that Kahre owed $2,049,172.97 in income taxes. Because Kahre did not file any employment taxes for his businesses from 1999 to 2003, Agent Cutler calculated an additional tax liability of $7,082,138.54.

In his testimony, Robert Kahre explained that he developed his payroll system after the IRS seized his property and equipment from a failed business. Kahre met John Nelson (Nelson), who authored books and taught classes about the IRS and the monetary system, and Nelson's ideas influenced Kahre to develop the payment system at issue.

According to Kahre, he developed his gold payroll system because the United States government had debauched the national currency and utilized inflation to confiscate the wealth of U.S. citizens. Kahre relied on court cases and the Gold Bullion Coin Act of 1985 that approved gold coins as legal tender. Kahre devised the independent contractor agreements to reflect that the IRS was a foreign agent for the World Bank and the International Monetary Fund (IMF). In Kahre's view, by collecting taxes for the IRS, employers illegally served as foreign agents for the World Bank and IMF. Kahre relied on several federal statutes, regulations, and "Presidential Documents" in the process of developing his payroll system to avoid the collection of taxes on behalf of foreign agents.

Loglia testified that, like Kahre, he was influenced by Nelson's ideas about monetary history and monetary policy. Loglia believed that Congress approved the use of gold coins as an alternative to paper currency. Because of his interest in gold payments, Loglia agreed to work for Kahre, and stopped filing tax returns in 1993, since his income, calculated in accordance with the face value of the gold and silver coins, was below the filing threshold. Loglia believed that there was legal precedent supporting the gold payment system, and he calculated his income based on the coins' face value on the ground that coins can be legally used to pay debt. Loglia was of the view that federal statutes and the Gold Bullion Coin Act of 1985 supported the gold payment system considering that coins were approved legal tender, and that gold clause contracts were legally authorized.

Lori Kahre testified that she started to work for her brother, Robert, in 1988. In 1993, Kahre commenced paying Lori her wages in silver dollars, and Lori thought the coins were legal tender based on Congressional acts. Lori was persuaded that the coins were legal tender because a coin shop did not collect taxes when exchanging cash for the coins, and the companies utilizing Kahre's payroll system never challenged the transactions.

Initially, Lori filed tax returns based on the face value of the silver coins. In 2000, Lori determined that she received between $63 and $125 wages per week, based on the face value of the coins. Because her wages calculated on the face value of the coins were below the threshold for filing taxes, Lori did not file any tax returns between 2001 and 2006.

The jury found Kahre guilty on all counts. Loglia was acquitted of conspiracy, but convicted on the remaining

counts. The jury found Lori guilty on all counts with the exception of one count of willfully attempting to evade or defeat tax.

## D. Sentencing

The presentence investigation report (PSR) calculated that Kahre had paid $25,572,307.17 in cash wages to his employees, and failed to withhold $10,891,791.72 in taxes. The PSR also determined that Kahre paid $95,175,992.14 in cash wages to the employees of thirty-five contracting businesses and thereby obstructed the collection of $40,847,545.80 in taxes. The PSR estimated the potential tax loss of Kahre's payroll scheme at $51,739,337.52. The PSR estimated an additional $5,696,466.10 in tax liabilities due to Kahre's failure to file tax returns in 1992, 1993, 1999, 2000, 2001, and 2002. Combined with the tax losses from the payroll scheme, the total potential tax loss was $57,435,803.52. From these calculations, the PSR recommended a total offense level of 39, with a guideline sentencing range of 262 to 327 months' imprisonment.[4]

The PSR calculated $16,060,104.72 in outstanding restitution from Kahre's personal tax liability of $5,168,313.00, and $10,891,791.72 in tax losses from the payroll scheme.

During the sentencing hearing, the district court determined that a base offense level of 30 was supported by the trial testimony and relevant conduct, and rejected Kahre's

---

[4] The PSR also recommended an upward adjustment for obstruction of justice in light of Kahre's false trial testimony, and denial of a downward adjustment for acceptance of responsibility.

objection that the applicable guideline range was 51 to 63 months. The district court held that there was ample support for an obstruction of justice enhancement, and that a downward adjustment for acceptance of responsibility was unwarranted. The district court concluded that the recommended restitution amount was supported by the jury's findings and the evidence at trial. After deciding that a downward variance was warranted, the district court sentenced Kahre to 190 months' imprisonment and three years of supervised release. The district court also ordered $16,060,104.72 in restitution with $10,891,791.72 "to be jointly and severally owed by co-defendants."

The district court sentenced Lori to seventy-two months' imprisonment, four years of supervised release, and $31,900 in restitution, and sentenced Loglia to twenty-six months' imprisonment, three years of supervised release, and $83,000 in restitution.

Appellants timely appealed their convictions and Kahre timely appealed his sentence.

## II. STANDARDS OF REVIEW

"We review de novo the district court's ruling on a motion to suppress." *United States v. Russell*, 664 F.3d 1279, 1280 n.1 (9th Cir. 2012) (citation omitted). "The court's factual findings are reviewed for clear error . . ." *Id.* (citation omitted).

"The district court's determination that the predicate law was clearly established is a question of law which we review de novo." *United States v. George*, 420 F.3d 991, 995 (9th Cir. 2005) (citation omitted).

"The district court's refusal to disqualify the prosecutor is reviewed for abuse of discretion." *United States v. Davis*, 932 F.2d 752, 763 (9th Cir. 1991), *as amended* (citation omitted).

"We review evidentiary rulings for abuse of discretion, though we review de novo the district court's interpretation of the Federal Rules of Evidence. . . ." *United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011) (citation omitted).

"This Court reviews the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Dann*, 652 F.3d 1160, 1175 (9th Cir. 2011) (citation and internal quotation marks omitted).

"A factual finding that a defendant obstructed justice is reviewed for clear error. . . ." *United States v. Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008) (citation omitted). "A district court's decision about whether a defendant has accepted responsibility is a factual determination reviewed for clear error. . . ." *United States v. Rosas*, 615 F.3d 1058, 1066 (9th Cir. 2010), *as amended* (citation omitted).

"A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework.  Factual findings supporting an order of restitution are reviewed for clear error.  The legality of an order of restitution is reviewed de novo." *Dann*, 652 F.3d at 1175 (citation omitted).

## III.   DISCUSSION

### A.  Denial of Kahre's Motions To Suppress

Kahre contends that his arrest and the seizure of payroll funds at Bank of the West were the products of an illegal, pretextual search.  The district court declined to address this issue on the merits, concluding that the motion to suppress was moot because the government was not introducing the seized evidence at trial.  The record confirms the district court's conclusion that the seized evidence was not introduced at trial, thereby rendering the motion to suppress moot.  *See United States v. Arias-Villanueva*, 998 F.2d 1491, 1502 (9th Cir.1993), *overruled on other grounds by United States v. Jimenez-Ortega*, 472 F.3d 1102, 1103-04 (9th Cir.2007).

In any event, suppression was not required merely because the arrest and corresponding search by federal agents were premised on a state warrant.  *See United States v. Hudson*, 100 F.3d 1409, 1415–16 (9th Cir. 1996) (upholding the validity of a federal agent's arrest and search premised on a state warrant).  Because the agents acted pursuant to a valid state arrest warrant, the payroll funds were properly seized in the search incident to Kahre's arrest.  *See United States v. Tank*, 200 F.3d 627, 631 (9th Cir. 2000).

Relying on Fed. R. Crim. P. 41(g),[5] Kahre contends that the payroll funds seized during his arrest should have been returned.  However, Rule 41 is inapplicable, as the seized funds were applied to Kahre's tax liabilities pursuant to a notice of levy.  *See United States v. Fitzen*, 80 F.3d 387, 388–89 (9th Cir. 1996) ("[A]n IRS tax levy will defeat a Rule 41(e) motion. . . . Regardless of whether the defendant owes federal taxes or state taxes, the existence of a tax levy demonstrates a right to possession adverse to that of the defendant.") (citation omitted).[6]  The district court, therefore, properly denied Kahre's motion to suppress and his request for the return of the seized funds pursuant to Rule 41.

Finally, Kahre asserts that the search warrants for the Bledsoe, Kimberly, and Grand Canyon properties were invalid general warrants because they did not specify any criminal activity.  To resolve this claim, we "must answer the threshold question of whether the warrant[s] incorporated Special Agent [Halper's] affidavit." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699 (9th Cir. 2009), *as amended* (citation omitted).  "If it was incorporated, then we

---

[5] Fed. R. Crim. P. 41(g) provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

[6] The 1996 version of Rule 41(e) corresponds to the current version of Rule 41(g). *See* Fed. R. Crim. P. 41(e) (1996).

evaluate the affidavit and the warrant as a whole, allowing the affidavit to cure any deficiencies in the naked warrant." *Id.* (citation and internal quotation marks omitted). "We consider an affidavit to be part of a warrant, and therefore potentially curative of any defects, only if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search." *Id.* (citations omitted). "A warrant expressly incorporates an affidavit when it uses suitable words of reference. . . ." *Id.* (citation and internal quotation marks omitted). The challenged warrants in this case expressly incorporated the affidavit, and a copy of the affidavit accompanied the warrants. As discussed, the affidavits detailed criminal activities committed in conjunction with Kahre's operation – failure to file tax returns, failure to withhold employment taxes, and conspiracy to evade taxes and to interfere with administration of the tax laws by the IRS. Because the search warrants, read in tandem with the accompanying affidavits, described specific crimes, the searches were not conducted pursuant to an impermissible general warrant. *See id.* at 699–702.

Kahre further contends that, because the warrants lacked any limitations, seizure of items was improperly left to the agents' discretion.

"The prohibition of general warrants imposes a particularity limitation, requiring warrants to specify the items to be seized and the locations to be searched. . . ." *United States v. Vasquez*, 654 F.3d 880, 884 (9th Cir. 2011) (citation and internal quotation marks omitted). "The description must be specific enough to enable the person conducting the search reasonably to identify the things

authorized to be seized. . . ." *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005) (citation and alteration omitted).

Attachment B to the warrants sufficiently limited the agents' discretion. Although Attachment B utilized the phrase "all records," the search was temporally limited to records "[f]or the period January 1, 1992, until December 31, 1993; and January 1, 1997 to present date[.]"**[7]** The

---

**[7]** Attachment B specified the search parameters as:

For the period January 1, 1992, until December 31, 1993; and January 1,1997 to present date:

A.   All records which deal with:  Robert Kahre, Bobby Kahre, or ALPS, Bobby K's Carpet Service, Bobby K's Home Care Service, Inc., Gold Contracts and Associates, HGK Products, Inc., Master Paints Distributing, Master Paints, Production Electric, Production Metal, Production Plumbing and Air Conditioning, Punchout Industries, Sherman Carpets, Sherman Tile and Marble, Sherman Granite and Tile, Union Pacific, Union Pacific Construction, Wright Painting and Drywall, Wright Painting, Wright Products, Inc., and any other business entities associated or related to Robert Kahre, including but not limited to, ledgers, journals, proposals, estimates, bids, contracts, correspondence to and from general contractors/sub-contractors/clients/customers/state agencies, labor records, employee records, time cards, expense records, income records, tax documents, tax returns, state records, payroll records, insurance records, incorporation records, incorporation filings, financial records, records showing the disposition of funds and acquisition of assets, scales, weighing device(s), records of the acquisition of gold or silver, disposition of gold or silver, contracts and correspondence that deal with the acquisition and

disposition of gold or silver, literature describing the use of gold or silver, envelopes which appear to be used for payroll purposes, labels, employee listings, employee identifying information and files, records of off-site storage, records of security alarms or personnel.

B. All records which deal with Robert Kahre, or any of the identified entities listed above, or any other business entities associated or related to Robert Kahre or Danille Cline, Richard Wellman, Myra Wellman (a.k.a. Myra Buonomo/Myra Kahre), Gary Bowers, Lori Rasmussen (a.k.a. Lori Kahre), including but not limited to, employment records, financial records, records showing the disposition of funds and/or acquisition of assets, and any other documents or records that includes a reference to the above named entities and individuals.

C. All records which deal with Robert Kahre, or any of the identified entities or individuals listed above, or any other business entities associated or related to Robert Kahre or: Pacific Tile and Marble, D & L Framing, LLC, R J Company Framing, LLC (a.k.a. D & L Framing), Mitchell Framing Contractors, Inc., Mitchell Drywall Systems, Inc., Mitchell General Contractors, Inc., R J Company, National Builders, Inc., National Builders, Olympic Framers, Inc., Bravo, Inc., Rhodes Framing, Rhodes Design & Development Corporation, Rocky Top Paint and Drywall, Bronco Construction, First Premier Drywall and Paint, Brandon LLC, Bricker Construction, Inc., ABC Roofing and Siding, Robert Dillon Framing, Toro Concrete, Inc., Big Bear Concrete, Action Concrete, AM Concrete, Bull Concrete, Concrete Systems, or any other business entities or individuals associated with payroll, employee leasing, cash payments, receipt of gold or gold certificates, records to include but not limited to contracts, agreements, proof of payments, financial records, invoices, correspondence to or from any of the

search was thus confined to records associated with Kahre's corporate entities and with the use of gold and silver payments. The search warrant affidavits furnished probable cause to search for the enumerated items. As a result, the search warrants provided the requisite specificity to limit the agents' discretion. *See Smith*, 424 F.3d at 1004–06.[8]

We affirm the district court's denial of Kahre's motion to suppress evidence seized from the Bledsoe, Kimberly, and Grand Canyon properties.

## B. The District Court's Determination of Tax Valuation Based on the Fair Market Value of the Gold and Silver Coins

Appellants contend that the district court erred in denying their motions to dismiss the indictments because they did not know that their use of gold and silver coins for payroll payments was illegal under the tax laws. Appellants specifically maintain that the district court's tax valuation predicated on the fair market value of the gold and silver

---

> above, and any other documents, records or evidence related to employees and/or payroll.

[8] Kahre's reliance on *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003) is misplaced. In *Bridges*, IRS agents searched a business premised on a warrant that "delineate[d] no clear material limitation or boundary as to its scope." *Id.* at 1017. Unlike the warrants in this case, the warrant in *Bridges* lacked any temporal parameters or limitations regarding the types of documents associated with the alleged criminal activity. *See id.* ("The list is a comprehensive laundry list of sundry goods and inventory that one would readily expect to discover in any small or medium-sized business in the United States. . . ."). The warrant in *Bridges* also failed to specify any criminal activity and did not incorporate the affidavit. *See id.* at 1018.

coins unfairly imputed criminal intent to their unknowing actions.

"The element of wilfulness cannot obtain in a criminal tax evasion case unless the law clearly prohibited the conduct alleged in the indictment." *George*, 420 F.3d at 995 (citations and internal quotation marks omitted). "Without sufficient clarity in the law, taxpayers lack the fair notice demanded by due process so that they may conform their conduct to the law." *Id.* (citation and internal quotation marks omitted). "However, a lack of prior appellate rulings on the topic does not render the law vague, nor does a lack of previously litigated fact patterns deprive taxpayers of fair notice." *Id.* at 995–96 (citation and internal quotation marks omitted). "Thus, criminal prosecution is permissible when it is clear beyond any doubt that the conduct is illegal under established principles of tax law." *Id.* at 996 (citation, alterations, and internal quotation marks omitted).

Appellants' argument is unpersuasive, as we have expressly held that coins are taxable as property when their fair market value exceeds their face value. In *Cordner v. United States*, 671 F.2d 367 (9th Cir. 1982), the appellants received $20 Double Eagle gold coins as corporate dividends. *See id.* at 368. After the appellants reported the dividends at the coins' face value, the IRS charged the appellants with a taxable dividend equivalent to the coins' fair market value. *See id.* We held that the IRS correctly assessed the coins as property based on their fair market value:

> We have no difficulty in holding that the gold coins here, though legal tender and hence money for some purposes, are also property to be taxed at fair market value because they

have been withdrawn from circulation and
have numismatic worth. When legal tender,
by reason of its value to collectors or the
intrinsic worth of its contents, has a fair
market value in excess of its face value or
tender, then it should be deemed property
other than money . . .

*Id.* (citations and internal quotation marks omitted).

In *Cal. Fed. Life Ins. Co. v. Comm'r*, 680 F.2d 85 (9th
Cir. 1982), the appellant exchanged Swiss francs for $20 gold
coins, and claimed a capital loss premised on the coins' face
value. *See id.* at 86. We affirmed the tax court's
determination that the gold coins were taxable as property
based on their fair market value. *See id.* We held that usage
of the term "money" in I.R.C. § 1001(b) required a realistic
assessment of the coins as property:

Section 1001(b) is clearly intended to permit
a realistic assessment of the economic gain or
loss attending a sale or exchange. That
purpose would be frustrated by an
interpretation that compelled gold coins to be
treated at a fraction of their true value. We
therefore conclude that money in § 1001(b)
refers to the currently circulating medium of
exchange, while property includes coins that
have, by reason of their value to collectors or
the intrinsic worth of their contents, a fair
market value in excess of their face value.
Because the key element is the excess of
market over face value, it is immaterial that

>such coins may be legal tender at their face
>value.

*Id.* (footnote reference and internal quotation marks omitted).

Appellants attempt to distinguish *Cordner* and *Cal. Fed. Life Ins. Co.* because those cases involved coins that had been withdrawn from circulation. However, in *Cal. Fed. Life Ins. Co.*, we declined to recognize this very distinction because we "agree[ed] with the Tax Court's conclusion that the technical status of the coins as legal tender is immaterial . . ." *Cal. Fed. Life Ins. Co.*, 680 F.2d at 86 n.3 (citation and internal quotation marks omitted). Rather, we emphasized that "[b]ecause the key element is the excess of market over face value, it is immaterial that such coins may be legal tender at their face value. . . ." *Id.* at 86 (footnote reference omitted).

Other courts have held that coins in circulation may be assessed at their fair market value. In *Joslin v. United States*, 666 F.2d 1306 (10th Cir. 1981), the Tenth Circuit considered whether the taxpayer should have reported payments in silver dollars at their numismatic value. *See id.* In that case, an attorney received 200 silver dollars for legal services, and reported the income as $200, instead of the fair market value of $1,000. *See id.* at 1306–07. The Tenth Circuit observed that "[i]f a taxpayer receives property other than cash as compensation, the taxpayer's income is measured by the property's fair market value." *Id.* at 1307 (citation omitted). Based on general tax principles, the Tenth Circuit held:

>Unquestionably, a silver dollar has both a face
>value and a separate value reflecting the
>coin's numismatic worth. To this extent a

silver dollar combines the characteristics of cash and property. When a taxpayer bargains for and benefits from the higher market value of silver coins, he or she must include this amount in income. That silver dollars are designated legal tender with a nominal value of one dollar acceptable at the United States Treasury to discharge one dollar of debt, or exchangeable for a one dollar Federal Reserve note, does not require a different result. . . .

*Id.* (citations and footnote reference omitted).

In *Stoecklin v. Comm'r*, 865 F.2d 1221 (11th Cir. 1989), the Eleventh Circuit reached a similar conclusion. In that case, the appellant, who was the trustee of an equity trust, formed a corporation for his accounting practice, of which he was the only shareholder and employee. *See id.* at 1222–23. The corporation paid the appellant's trust 250 silver dollars per month for the appellant's services. *See id.* at 1223. Although the corporation deducted the coins' fair market value as expenses, the appellant only reported the face value of the coins as income. *See id.* The IRS subsequently sought a deficiency premised on the fair market value of the coins. *See id.* Applying the precepts developed in *Cordner* and *Joslin*, the Eleventh Circuit rejected the appellant's argument that coins still in circulation were assessed at face value, and held that the IRS properly sought a deficiency premised on the fair market value of the coins. *See id.* at 1225; *see also Lary v. Comm'r*, 842 F.2d 296, 299 (11th Cir. 1988) ("Where coins have a fair market value in excess of their face value,

their potential use as legal tender is irrelevant. . . .") (citation omitted).[9],[10]

Based on these longstanding and consistent precedent, we conclude that Appellants had ample notice that their payroll scheme, premised on the exchange of gold and silver coins for envelopes of cash, triggered the requirement to remit payroll taxes to the IRS and to report the payments as income based on the fair market value of the coins. *See George*, 420 F.3d at 995–96.[11]

---

[9] Appellants contend that gold and silver coins are statutorily valued at face value. However, this appeal does not really concern the statutory value of gold and silver coins when utilized as legal tender. *See Cordner*, 671 F.2d at 368; *Stoecklin*, 865 F.2d at 1225. Instead, this appeal addresses Appellants' payment of wages in gold and silver coins in a scheme to avoid payroll taxes, as evidenced by the facts that Kahre's employees were required to immediately return the coins for cash and, that if an employee retained the coins, his wages were reduced by the fair market value of the coins.

[10] The Tax Court has also opined that coins are taxed as property at fair market value when used as compensation for services or goods. *See Smith v. Comm'r*, T.C.Memo. 1998-148, 1998 WL 191835, at *3 (U.S. Tax Ct. 1998) ("When the fair market value of legal tender exceeds its face value, such legal tender is property other than money.") (citations omitted).

[11] In their request for judicial notice, Appellants proffer a memorandum from IRS Senior Counsel Mark Howard as confirmation that the IRS assesses coins at face value, and that Appellants' payments in gold and silver coins were consistent with IRS policy. However, the referenced memorandum primarily analyzed whether a taxpayer could pay a tax bill with gold and silver coins at face value. Citing *Joslin*, *Cordner*, and *Cal. Fed. Life Ins. Co.*, the memorandum opined that "the taxpayer may have taken his pay out of the business in gold and silver coins and reported only the face value of the coins as income. We note that others have tried such an approach in the past. In each of these cases, the courts required the taxpayers to recognize income based on the market value and not on the

We are not persuaded by Appellants' argument that the Gold Bullion Coin Act of 1985, Pub. L. No. 99-185, 99 Stat. 1177, overruled prior legal precedent that coins are assessed at fair market value. Although the Gold Bullion Coin Act provides the Secretary of the Treasury with the authority to mint gold and silver coins for circulation, *see* 31 U.S.C. § 5112(a)(7)–(11) (2010),[12] there is no statutory language reflecting Congressional intent to overrule prior legal precedent or to establish the taxable value of the coins as their face value. *See id.*; *see also Sklar v. Comm'r*, 549 F.3d 1252, 1262 (9th Cir. 2008) (observing that if Congress intended to overrule judicial precedent concerning tax laws, "it would have expressed its intention more clearly") (citation omitted). Further, the legislative history of the Act reflects, if anything, Congressional intent that gold coins retain their fair market value. *See* 131 Cong. Rec. H10528-05, 1985 WL 721189 (Cong. Rec. Dec. 2, 1985) (statement of Rep. Annunzio) ("The gold coins will be sold at the market price of gold plus a small charge for minting, marketing and distribution, beginning October 1, 1986. . . ."); *see also id.* (statement of Rep. Lewis) ("The actual denomination of these new coins will be obvious to everyone-1 troy ounce, half-ounce, quarter-ounce, and tenth-ounce.   Their value will be determined by the free market, just as the values of all other

---

face value of the coins.  This case may provide evidence of some sort of ongoing scheme . . ."  The memorandum does not support Appellants' argument that their payroll payments were consistent with IRS policy. *See* Consolidated Appellants' Request to Take Judicial Notice of Government Records and Facts Contained Therein That Can Be Accurately and Readily Determined, March 5, 2012, Exh. 1, at 2, 5, Case No. 09-10471, Docket No. 70.

[12] The Gold Bullion Coin Act of 1985 is currently codified at 31 U.S.C. § 5112 (2010).

goods and services are determined."). The legislative record contains no linguistic or historical support for Appellants' contention that the Gold Bullion Coin Act of 1985 overruled prior legal precedent formulating tax assessments for gold and silver coins.

Appellants' reliance on 31 U.S.C. § 5118(a) and (d) in support of their argument that the district court's ruling violated their right to contract is similarly misplaced. According to Appellants, § 5118 legalizes contracts like theirs, that contain "gold clauses."

Section 5118 provides in relevant part:

> (a) In this section—(1) gold clause means a provision in or related to an obligation alleging to give the obligee a right to require payment in—(A) gold; (B) a particular United States coin or currency; or (C) United States money measured in gold or a particular United States coin or currency.
>
> . . .
>
> (d)(1) In this subsection, obligation means any obligation (except United States currency) payable in United States money. (2) An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977.

*Id.* (internal quotation marks omitted).

Assuming *arguendo* that § 5118 does "legalize" contracts containing gold clauses, it would be of no help to Appellants, because Appellants' schemes did not implicate gold clause contracts as defined in § 5118. *See* § 5118(a)(1) (defining "gold clause" as an obligation purporting to give the obligee the right to demand payment in, among other things, gold); *see also* 60 Am.Jur.2d Payments § 26 (2012) ("A gold clause is a provision in or related to an obligation alleging to give the obligee a right to require payment in gold, a particular United States coin or currency, or United States money measured in gold or a particular United States coin or currency. An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. . . .") (footnote references and internal quotation marks omitted). Rather than utilizing a gold clause, *i.e.*, a clause designed to give employees a right to demand payment in gold, Appellants evaded income and payroll tax obligations by *requiring employees* to exchange gold and silver coins for cash in order to receive their weekly wages. This practice turned the gold clause standard on its head. Rather than the obligee (the employee) demanding payment in gold from the obligor (Kahre), the obligor (Kahre) required the obligee (the employee) to accept payment in gold that would then be repaid with cash. Nothing in 31 U.S.C. § 5118 or cases interpreting that statute validates Kahre's practice.

Notably, if an employee retained a gold or silver coin in lieu of cash, the fair market value of the coin, as opposed to its face value, was deducted from the employee's wages. The evidence at trial also established that the Kahres did not

participate in the gold and silver coin exchange required of Kahre's employees, a clear indication of the illegitimacy of the practice. Given the inapplicability of § 5118 to Kahre's scheme, Appellants' argument regarding their right to contract pursuant to that section is unpersuasive.

In the alternative, Appellants maintain that the Department of Justice and the IRS lack authority to value coinage. In essence, Appellants erroneously assume that the IRS thwarted Congress' monetary powers, including the valuation of money. The flaw in Appellants' assumption is that the IRS did not establish valuation of coinage as a matter of monetary policy. Rather, the IRS interpreted and applied the tax code defining the taxable value of gold and silver coins as property when used as compensation for services rendered. The IRS's actions in no way violated the separation of powers, as the IRS is "the authority on the interpretation and application of the Internal Revenue Code . . ." *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 942 (9th Cir. 2008); *see also* 26 U.S.C. § 7805(a) (delegating authority concerning the Internal Revenue Code).

Appellants again urge application of the rule of lenity to reverse their convictions, pointing to the "uncertainty" of their tax obligations. "The rule of lenity only applies, however, where there is a grievous ambiguity or uncertainty in the language and structure of the statute, such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute. . . ." *United States v. Carona*, 660 F.3d 360, 369 (9th Cir. 2011), *as amended* (citation, alterations, and internal quotation marks omitted). "Because the meaning of language is inherently contextual, we have declined to deem a statute ambiguous for

purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the government. . . ." *Id.* (citation and alteration omitted) (emphasis in the original).

As discussed, several federal courts, as well as the Tax Court, have held that gold and silver coins are assessed at their fair market value when used for compensation for services rendered. The applicable tax laws and corresponding regulations also establish that, when property is used as compensation, it is assessed at fair market value. *See* 26 U.S.C. § 61(a)(1) (defining gross income as including "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items . . ."); 26 C.F.R. § 1.61-2(d)(1) ("[I]f services are paid for in property, the fair market value of the property taken in payment must be included in income as compensation. . . ."). Additionally, Appellants were charged with violating 26 U.S.C. § 7202, with the operative Indictment alleging that Appellants "*willfully* fail[ed] to collect or truthfully account for and pay over such tax . . ." (emphasis added). Inclusion of a scienter requirement "mitigates a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *United States v. Guo*, 634 F.3d 1119, 1123 (9th Cir. 2011) (citations, alteration, and internal quotation marks omitted).[13]

---

[13] Appellants posit that the government's confusion concerning the valuation of gold and silver coins demonstrates that the law is unsettled. In support of the premise that the government is in fact confused, they point to the indictment in *United States v. von Nothaus*, Case No. 5:09-27 (W.D. N.C.) (von NotHaous Indictment). Appellants assert that governmental confusion is evidenced by the allegation in the von Nothaus Indictment that coins constitute United States currency, rather than property. However, *von Nothaus* involved the creation and promotion of

We hold that the district court correctly determined that gold and silver coins used to pay wages were properly assessed at their fair market value, and that Appellants had sufficient notice that their conduct was illegal under the tax laws.

## C. Disqualification of the Prosecutor

Although we have held that the mere threat of civil litigation does not warrant a prosecutor's disqualification, *see United States v. Wencke*, 604 F.2d 607, 611 (9th Cir. 1979), we have not extensively addressed disqualification premised on an extant civil action against the prosecutor. In *United States v. Kember*, 685 F.2d 451 (D.C. Cir. 1982), the D.C. Circuit addressed an analogous claim. In *Kember*, the defendants sought disqualification of two federal prosecutors who were named as defendants in a lawsuit concerning a search conducted in bad faith. *See id.* at 458. The D.C. Circuit held that the lawsuit alone did not require disqualification, explaining that:

> The potential conflict of interest that might result from a personal civil suit filed against an Assistant United States Attorney (AUSA) by a defendant in a criminal case for acts undertaken by the AUSA in his official capacity in the criminal matter would have to be very strong before disqualification would be justified. It could not be justified by mere

a private coin as competing currency, and not violations of the tax code through the use of wage payments in gold and silver coins to avoid paying payroll taxes. As in this case, the legal analysis turned on the manner in which the coins were used.

> inference from the filing of the suit but would
> require proof, by clear and convincing
> evidence, of a prima facie case of misconduct
> on the part of the AUSA. The defendants
> failed to produce the proof required by this
> standard.

*Id.* at 459 (citation omitted); *see also United States v. Heldt*,
668 F.2d 1238, 1275–77 (D.C. Cir. 1981) (per curiam), *as
amended* (clarifying that a lawsuit filed by a criminal
defendant against a prosecutor does not result in automatic
disqualification of that prosecutor).[14]

Appellants contend that the district court improperly
applied a clear and convincing standard of proof in resolving
the disqualification issue because the Supreme Court
overruled *Kember* in *Young v. United States ex rel. Vuitton Et
Fils*, 481 U.S. 787 (1987) (Vuitton). In *Vuitton*, the Supreme
Court considered whether a private attorney, who was the

---

[14] Appellants contend that the denial of qualified immunity in the *Bivens*
action was a unique event that impermissibly motivated the criminal
prosecution. We disagree. The district court in the civil action was
required to assume that the allegations of impermissible motivation were
true. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff
Dep't*, 533 F.3d 780, 798 (9th Cir. 2008) (assuming the truth of allegations
in the Complaint for the purpose of qualified immunity analysis). Given
the posture of the civil case, the district court's denial of qualified
immunity does not reflect a "unique event" distinguishing this case from
*Kembler*. We also do not consider the prosecutor's dismissal of the appeal
in the *Bivens* case as an admission of misconduct, or proof of an
impermissible conflict of interest. The record simply reflects that
Appellants and the prosecutor, as one of several defendants, dismissed the
appeal based on the parties' stipulations. Moreover, the government had
an exceptionally strong case against Appellants irrespective of the
prosecutor's involvement.

beneficiary of an injunction regarding a trademark, could be appointed to prosecute contempt charges for violations of the injunction. *See id.* at 790–91. The Supreme Court observed that "[p]rivate attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated. . . ." *Id.* at 804. "A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id.* (footnote reference omitted). The Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.* at 809 (footnote reference omitted). The Supreme Court also held that harmless error review was inapplicable because the appointment of an interested prosecutor constitutes structural error. *See id.* at 809–10.

Although the Supreme Court held that, in certain situations, appointment of a prosecutor with a conflict of interest constitutes reversible error, the Court did not alter the standard for determining whether a disqualifying conflict exists, or even discuss *Kember*. Concluding that a conflict existed in *Vuitton* was an easy call. The appointed prosecutor was a private attorney who represented Louis Vuitton, the beneficiary of the injunction being enforced. *See id.* at 791–92. The Supreme Court identified the pecuniary interest of the retained counsel/prosecutor as an "inherent conflict." *Id.* at 807. In recognition of that inherent conflict, the Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.* at 808 (footnote reference omitted). Because of the stark difference in facts between *Vuitton* and this case, we

are not persuaded that *Vuitton* is applicable here. We are, however, persuaded by and adopt the reasoning of the D.C. Circuit in *Kember*. We therefore hold that proof of a conflict must be clear and convincing to justify removal of a prosecutor from a case. Otherwise, as noted in *Heldt*, prosecutors could be removed simply by the filing of an action against them. *See Heldt*, 668 F.2d at 1276.

This rule is consistent with our precedent, which has treated the Supreme Court's ruling in *Vuitton* as a narrow one. *See F.T.C. v. Am. Nat'l Cellular*, 868 F.2d 315, 319 (9th Cir. 1989) ("The *Vuitton* opinion focused quite narrowly on the conflicts of interest faced by private attorneys trying to represent simultaneously both their private clients' interests and the public interest in prosecuting contemnors. Specifically, the Court in *Vuitton* appears largely to have been concerned with conflicting *financial* interests. . . .") (citation omitted) (emphasis in the original). In *Am. Nat. Cellular*, we compared the conflict in *Vuitton* to the financial interests that would foreclose the participation of a government prosecutor. *See id.* (referencing 18 U.S.C. § 208(a), which prohibits government employees from participating in matters in which they have a *financial* interest). It is undisputed that the prosecutor's alleged conflict of interest in this case arose after he was already involved in the case as a government attorney, and in no way involved a financial interest on the part of the prosecutor. The dichotomy between the private attorney's appointment in *Vuitton* and non-prejudicial potential conflicts of interest arising in other contexts is exemplified by the facts of *United States v. Lorenzo*, 995 F.2d 1448 (9th Cir. 1993). In that post-*Vuitton* case, we considered whether the United States Attorney's Office in Hawaii should have been disqualified because some of its employees were victims of a tax protest scheme. *See id.* at 1451–52. Relying on *Heldt*,

we held that disqualification was not warranted because the defendants failed to demonstrate prejudice. *See id.* at 1453. *Lorenzo* establishes that, at a minimum, defendants must demonstrate prejudice from the prosecutor's potential conflict of interest. *See id.* Under *Kember*, which was not overruled by *Vuitton*, clear and convincing evidence of prosecutorial misconduct must be presented. *See Kember*, 685 F.2d at 459. This requirement is logical, otherwise any defendant could disqualify a prosecutor by simply filing a *Bivens* action without presenting clear and convincing evidence of prosecutorial misconduct, but only "complain[ing] of some action taken by the prosecutor outside of his quasi-judicial capacity . . ." *Heldt*, 668 F.2d at 1276.

Appellants contend that the prosecutor's comments regarding threats to his pension from the *Bivens* action and his statement that the case was "personal" demonstrate the requisite misconduct. We do not agree. As the district court observed, the prosecutor's remarks occurred in 2008, almost three years after the filing of the initial indictments in 2005, and thereby could not have been the impetus for filing the criminal charges. Moreover, even inflammatory comments made during a trial do not necessarily warrant reversal. *See Hein v. Sullivan*, 601 F.3d 897, 913, 916 (9th Cir. 2010) (holding that a prosecutor's derogatory comments in closing argument regarding defendants and defense counsel were not prejudicial). The prosecutor's isolated remarks do not constitute clear and convincing evidence of misconduct stemming from an impermissible conflict of interest. *See id.* at 916.

In a similar vein, Appellants maintain that disqualification was justified because of the heightened prosecutorial discretion in tax cases, *i.e.*, tax deficiencies may be pursued

criminally or civilly. However, this argument overlooks the reality that an Assistant United States Attorney does not possess unbridled discretion to pursue prosecution in tax cases. Rather, the Department of Justice's Tax Division must approve all criminal tax prosecutions. *See* U.S.A.M. § 6-4:010 ("To achieve uniform, broad, and balanced criminal tax enforcement, the Attorney General has authorized the Tax Division to oversee all federal criminal tax enforcement and to authorize or decline investigations and prosecutions in tax matters. . . .") (citation omitted). Appellants do not persuasively contend that the Department of Justice's Tax Division operated under any conflict or that its supervisory role was ineffective in this case.

Appellants next argue that the prosecutor's trial conduct manifested his conflict of interest. For example, Appellants assert that the prosecutor, due to his conflict of interest, failed to elicit from Molesworth that her testimony in the first trial was perjured. However, Appellants fail to identify any aspect of Moleworth's testimony that was false. *See United States v. Bingham*, 653 F.3d 983, 995 (9th Cir. 2011) ("We cannot presume that the prosecutor knew that the prior inconsistent statement was true but elicited perjured testimony anyway, and [Appellants] point[ ] to nothing in the record that shows the intentional use of perjured testimony. . . .") (citation, alteration, and internal quotation marks omitted). Appellants in no way challenge the district court's ruling that the government properly disclosed to Appellants prior to trial Molesworth's statement that she had previously perjured herself and that Appellants' counsel effectively cross-examined Molesworth on that point. The district court's unchallenged ruling rebuts Appellants' allegations of prosecutorial misconduct.

Finally, Appellants contend that the prosecutor suborned perjury because one witness' testimony was contradicted by other witnesses. However, Appellants fail again to effectively challenge the district court's ruling that the contradictory testimony presented a credibility issue, not perjury. Therefore, the district court did not abuse its discretion in ruling that the prosecutor should not be dismissed on this basis. *See Davis*, 932 F.2d at 761–62.[15]

Because Appellants failed to present clear and convincing evidence of an impermissible conflict of interest or of prejudice, we conclude that the district court properly denied Appellants' motion to disqualify the prosecutor. *See Lorenzo*, 995 F.2d at 1453; *see also Kember*, 685 F.2d at 459.

---

[15] Appellants posit a litany of alleged discovery violations reflecting the prosecutor's conflict of interest. However, the district court did not find any such violations, and its rulings with respect to disqualification on these bases did not constitute an abuse of discretion. *See United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) (holding that reversal for "abuse of discretion" is permissible only when the ruling or finding being reviewed "is illogical, implausible, or without support in inferences that may be drawn from the facts in the record").

Appellants also accuse the prosecutor of misrepresenting the factual basis for a summary chart that was received into evidence. The district court ruled that the summary chart was admissible, and that it did not "hurt the defendant in any way, shape, or form." Here too, the district court did not abuse its discretion by declining to disqualify the prosecutor.

## D. Evidentiary Rulings

### 1. Evidence Concerning the Legality of Gold Clause Contracts

Appellants challenge the district court's exclusion of evidence concerning the legality of gold clause contracts.

As discussed, the district court properly determined that gold and silver coins should be assessed at fair market value when used as compensation for services. Based on this correct legal conclusion, the district court held that proffered evidence attempting to otherwise establish the requirements of governing tax law was irrelevant to the issue of willfulness. However, Appellants were permitted to introduce statutes, IRS pamphlets, tax provisions and other sources upon which Appellants relied in good faith during the duration of their wage payment system.

The district court's ruling fully comported with our precedent. In *United States v. Powell*, 955 F.2d 1206 (9th Cir. 1992), *as amended,* we observed that, in a criminal tax case, "a district court may exclude evidence of what the law *is* or *should be* . . ." *Id.* at 1214 (citation omitted) (emphasis in the original). In contrast, the district court "ordinarily cannot exclude evidence relevant to the jury's determination of what a defendant *thought the law was* . . . because willfulness is an element of the offense." *Id.* (emphasis in the original). "[S]tatutes or case law upon which the defendant claims to have actually relied are admissible to disprove that element if the defendant lays a proper foundation which demonstrates such reliance." *Id.* (citations and emphasis omitted). "Legal materials upon which the defendant does not claim to have relied, however, can be excluded as

irrelevant and unnecessarily confusing because only the defendant's subjective belief is at issue: the court remains the jury's sole source of the law." *Id.* "In addition, the court may instruct the jury that the legal material admitted at trial is relevant only to the defendant's state of mind and not to the requirements of the law, and may give other proper cautionary and limiting instructions as well." *Id.*

The district court, therefore, properly excluded evidence, including proffered expert testimony, that conflicted with its correct legal ruling that coins were assessed at fair market value for tax purposes irrespective of their use as legal tender. *See id.*[16]

Appellants' contention that the district court's evidentiary rulings improperly diluted the burden of proof and precluded a complete defense is unpersuasive. Although the district court excluded evidence that contradicted its correct legal ruling regarding valuation of gold and silver coins for tax purposes, the court properly instructed the jury that:

> A defendant's conduct is not willful if that person acts due to a good faith misunderstanding of the law. Because the government has the burden of

---

[16] Appellants' assertion that the district court erred in excluding evidence that its ruling was the first in the nation is unavailing. The district court's exclusion of the proffered evidence did not impact the presentation of evidence of Appellants' good faith beliefs, as the court's ruling on valuation of the coins occurred subsequent to the charged conduct and could not have been relied upon by Appellants in implementing their wage payment system. *See Powell*, 955 F.2d at 1214 (instructing that evidence is admissible only if relied upon by defendants). In any event, as a factual matter, the district court's ruling was not the first in the nation. Rather, it was premised on prior legal precedent.

proving a defendant acted willfully, the government also has the burden of negating a defendant's claim that because of a misunderstanding of the law, the defendant had a good faith belief that he was not violating the relevant provisions of the tax code.

The district court's ruling and corresponding instructions encompassed Appellants' good faith defense. *See Powell*, 955 F.2d at 1214 ("In addition, the court may instruct the jury that the legal material admitted at trial is relevant only to the defendant's state of mind and not to the requirements of the law, and may give other proper cautionary and limiting instructions as well.").

### 2. Other Evidence Concerning Appellants' Good Faith Belief That The Wage Payments Were Not Taxable

Appellants contend that the district court erred under Fed. R. Evid. 803(3)[17] when it excluded testimony of the Kahres'

---

[17] Pursuant to Fed. R. Evid. 803(3), as it existed at the time of the trials at issue in this case:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> (3) A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will.

contemporaneous statements regarding their good faith belief that the payments were legal and non-taxable.

Appellants challenge only two rulings by the district court. In the first challenged ruling, the district court sustained the government's objection to testimony in which the witness explained that Kahre told him coins were taxed at their face value. In the second challenged ruling, the district court excluded testimony that Lori Kahre instructed another witness to pay her own taxes.[18] This proffered testimony, if admitted, "would have been hearsay . . . about defendants' state of mind at the time, a subject about which they could be examined and cross-examined if they took the stand. But as a second-hand statement of memory or belief to prove the fact remembered . . . it is not only hearsay, but irrelevant hearsay." *United States v. Bishop*, 291 F.3d 1100, 1110–11 (9th Cir. 2002) (internal quotation marks omitted).[19] Therefore, the district court did not plainly err in excluding it.

Regardless, any error in excluding the testimony was harmless. *See id.* at 1108 ("Not every hearsay error amounts to a constitutional violation. At a minimum, a defendant

---

[18] Because Appellants did not argue before the district court that the testimony was admissible pursuant to Fed. R. Evid. 803(3), we review for plain error. *See United States v. Orm Hieng*, 679 F.3d 1131, 1135 (9th Cir. 2012) ("We review evidentiary rulings to which no objection was made for plain error.") (citation omitted).

[19] Appellants make the additional argument that the district court violated their due process rights by admitting evidence of their good faith beliefs only if Appellants testified. However, the district court actually permitted Appellants to offer proof of their good faith beliefs through other sources. Appellants also testified during trial, providing the best evidence of their good faith beliefs. *See Bishop*, 291 F.3d at 1110 ("The best evidence would be the defendant's own testimony. . . .").

must demonstrate that the excluded evidence was important to his defense. . . .") (citation and alteration omitted).  Not only was the government's case exceptionally strong, but Kahre, Lori, and Loglia each testified extensively about the good faith that underlay their belief that the gold payment system was legal.  *See Bishop*, 291 F.3d at 1110 ("Such [third-party] testimony may fall under the state of mind exception to the rule against hearsay, but it would still be self-serving, and duplicative of the defendants' own testimony about their state of mind, if they chose to testify. . . .") (internal quotation marks omitted).[20]

## E.  The District Court's Partiality

Appellants contend that a new trial is warranted because of the district court's partiality, as evidenced by its improper comments and conduct.

"We will reverse a trial court for excessive judicial intervention only in cases of actual bias . . . or if the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality, and the alleged

---

[20] Appellants further contend that the district court erred in excluding an IRS agent's report that a prior investigation had been closed for lack of criminal intent.  However, Appellants were not prejudiced, as the IRS agent testified and confirmed his conclusions regarding the lack of proof of criminal intent.

Appellants also argue that the district court erred in excluding evidence concerning the amount of force used against Lori Kahre during the search.  Although Appellants cited no specific ruling, it appears that the district court excluded evidence related to the searches as irrelevant and potentially prejudicial.  Here too, the exclusion at issue was not prejudicial, because Lori's testimony completely elucidated every aspect of her defense.

misconduct had a prejudicial effect on the trial." *United States v. Scott*, 642 F.3d 791, 799 (9th Cir. 2011) (citation and internal quotation marks omitted). "Before a jury's verdict will be overturned because of the conduct of a trial judge in rebuking or punishing an attorney or otherwise intervening in the proceedings, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." *Id.* (citation omitted). "The assessment is to be made, moreover, in light of the evidence of guilt." *Id.* (citation omitted).

Appellants urge the conclusion that the district court utilized prejudicial analogies when explaining its evidentiary rulings to the jury. For example, the district court explained that the silver coins could be placed into evidence, but could not be sent back with the jury for jurors to examine, just as narcotics can be placed in evidence, but not sent back with the jury. The district court analogized the chain of custody utilized in narcotics cases to the introduction of records seized from a residence. The district court also utilized what it characterized as the "ridiculous example" of an organized crime figure having a business purpose in the process of addressing whether a witness could testify regarding a possible business purpose underlying Kahre's payroll system.

Although the district court utilized analogies, its comments did not undermine Appellants' defense. It is presumed that the jury followed the district court's instructions that it was not to give any weight to the court's explanatory comments. *See Scott*, 642 F.3d at 800. These comments do not justify a new trial, particularly in view of the strong evidence of guilt. *See id.* at 799.

Although Appellants complain that the district court improperly objected to the defense's cross-examination and denigrated counsel, the record does not reflect that the district court interfered with or impeded the defense's cross-examination at all. Contrary to Appellants' assertion that the district court denigrated counsel by impermissibly objecting to the defense's cross-examination, the record reflects that the district court interrupted those questions that were deemed irrelevant or inappropriate. For example, the district court interrupted defense counsel when he asked a witness if escrow could close if "the person may not have remembered signing it because they were intoxicated when they signed it[.]" The district court also interrupted a witness who was reading from documents although the witness lacked any personal knowledge of the transaction related to the documents. When defense counsel argued that government witnesses had been allowed to read from documents, the district court replied that "[t]o the extent the Government did it and nobody objected, they shouldn't have. . . ." The other asserted instances in which the district court interrupted cross-examination similarly reflect that the district court properly intervened to frame the questioning. Appellants made no showing that the district court's rulings in controlling the proceedings were incorrect, or that they were unable to mount an effective defense. In sum, the district court did not improperly impede Appellants' presentation of their case. *See United States v. Gurolla*, 333 F.3d 944, 958 (9th Cir. 2003) (explaining that the district court's rulings regarding cross-examination constitute reversible error only in the event the rulings resulted in the denial of a fair trial).

Appellants' assertion that the district court interrupted Loglia's testimony and denigrated Loglia's good faith belief in the wage payment system is similarly unavailing. During

his testimony, Loglia stated that he relied in part on Civil War era cases for his use of gold and silver coins for wage payments. The district court did not denigrate Loglia's reliance on the case law. Rather, the district court accurately clarified that the weight the jury gave to a legal opinion admitted into evidence may be affected by changes in legal precedent. By way of example, the district court simply remarked that an individual could not rely in good faith on "*Plessy v. Ferguson* that used to say separate but equal was okay in schooling. . . ." The district court also did not commit reversible error when it merely observed that prior case law did not "represent the law that applies to this case, nor did it ever, by the way. It's the effect on Mr. Loglia that counts."

Contrary to Appellants' assertions, neither did the district court denigrate Loglia's reliance on an IRS letter that purportedly supported the wage payment system. The government objected to admission of the letter based on its lack of authentication, and the district court innocuously remarked that it was not uncommon for government letters to be fabricated. However, the district court admitted the letter into evidence because "if [Loglia] actually got the document and relied on it, thinking it was real, that's what counts. It's not whether in fact it was real."

Appellants further contend that the district court impermissibly explained the government's theory of the case when making its evidentiary rulings. Appellants fault the district court for commenting on the government's theory that Lori Kahre acted as a straw buyer for the silver coins; that the government's charges were based on a conspiracy; that the government's argument was that the gold clause contracts were a sham; and that the government's challenge to a witness was premised on the witness's bad acts. However,

the record reflects that the district court did not impermissibly explain the government's theory. Instead, the district court merely remarked that "[o]ne of the contentions of the Government in this case is that Ms. Kahre was simply a straw buyer and that the real owner was Mr. Kahre . . . So that's for the jury to decide," and that "it is the Government's contention these people were all in conspiracy together. So I don't know what your objection is." In permitting testimony concerning an unindicted coconspirator, the district court simply observed that waiver of the hearsay rule was warranted "[b]ecause it's the whole government theory the reason [the unindicted coconspirator] was doing all these chicaneries was because he was in league with [Appellants]. . . ." The district court also passively noted the government's position that a gold clause contract utilized by Appellants was "a sham because it's a device by which they are alleging Mr. Kahre used to avoid paying taxes. That is what they're claiming."

In each case, the district court referred to the government's theory as it related to evidentiary issues and clarified that it was within the province of the jury to determine the validity of the government's theory. Thus, we conclude that Appellants are not entitled to a new trial based on the district court's comments or conduct. Our conclusion is further supported by the strength of the government's case, and the court's curative instructions. *See Scott*, 642 F.3d at 800.

## F. Robert Kahre's Sentence

Kahre challenges the district court's calculation of his adjusted offense level and of the applicable guideline range,

both of which were largely attributable to the tax loss associated with his crimes of conviction.

"The government bears the burden of establishing the base offense level, and, hence, here, the amount of tax loss, by a preponderance of the evidence." *United States v. Montano*, 250 F.3d 709, 713 (9th Cir. 2001) (citation omitted). "Under the preponderance of the evidence standard, the relevant facts must be shown to be more likely true than not." *Id.* (citations and internal quotation marks omitted). "In determining the total tax loss attributable to the offense, all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." *Bishop*, 291 F.3d at 1115 (citation and alteration omitted). "Tax loss is determined from the reasonably foreseeable conduct of all co-actors, not just the defendant's own conduct. . . ." *Id.* (citation and alteration omitted).

Kahre asserts that, because his workers were independent contractors, the district court erred in calculating a tax loss premised on payroll taxes for employees.

The IRS has established a twenty-factor test to differentiate an employee from an independent contractor for tax purposes. *See* IRS Rev. Rul. 87-41 (1987).[21]

---

[21] The factors include: (1) the employer's right to require the worker's compliance with instructions; (2) the employer's training requirements; (3) the integration of the worker's services into the employer's business; (4) the worker's personal rendering of services; (5) the employer's hiring, supervision, and payment of assistants; (6) a continuing relationship between the employer and the worker; (7) the employer's setting of hours; (8) the employer's requirement of full-time service; (9) performance of

"[G]enerally the relationship of employer and employee exists when the person or persons for whom the services are performed have the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. . . ." *Id.* "Thus, if such a relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like." *Id.*

The trial testimony amply supports the district court's finding that Kahre's employees were not independent contractors. Rodriguez testified at length regarding the control Kahre exercised over his employees' work, and expressly acknowledged that the employees were not independent contractors. The district court instructed the jury that it was required to apply the twenty-factor test and determine whether Kahre's workers were employees or independent contractors. Having followed that instruction, the jury found Kahre guilty on all counts. Given the evidence and the jury's findings from that evidence, the district court did not err in finding that Kahre failed to pay the requisite payroll taxes for his employees, or in calculating the amount

---

work on the employer's premises; (10) the worker's performance of services in a sequence set by the employer; (11) the employer's requirement that the worker submit oral or written reports; (12) payments on an hourly, weekly, or monthly basis; (13) the employer's payment of business or travel expenses; (14) the employer's furnishing of materials or tools; (15) lack of significant investment in the facilities by the worker; (16) lack of realization of loss or profit by the worker; (17) lack of work for multiple firms by the worker; (18) lack of availability of the worker's services to the general public; (19) the employer's right to discharge the worker; and (20) the worker's right to terminate her or his services. *See* IRS Rev. Rul. 87-41.

of loss from the tax scheme. *See Bishop*, 291 F.3d at 1115 (reasoning that tax loss is to be calculated in view of the totality of the tax evasion scheme).[22]

Kahre maintains that he was not responsible for withholding taxes from wages paid to employees of the thirty-five businesses that utilized his payroll services. However, "[i]n determining the total tax loss attributable to the offense, *all* conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated. . . ." *Id.* (citation and alteration omitted) (emphasis added). Kahre was responsible for "the reasonably foreseeable conduct of all co-actors, not just [his] own conduct. . . ." *Id.* This means that Kahre was indeed responsible for the conduct of the businesses that utilized his payroll services, particularly since trial testimony revealed that Kahre devised these payroll services, and administered them in the same illicit manner as his own. The district court, therefore, did not err in determining it was more likely than not that the tax loss incurred from these utilizing companies was attributable to Kahre.

---

[22] Kahre maintains that two of his several hundred employees were independent contractors as noted in their plea agreements. However, classification of two individuals as independent contractors would not undermine the district court's findings regarding the status of the overwhelming majority of the employees. *See Montano*, 250 F.3d at 713 ("Under the preponderance of the evidence standard, the relevant facts must be shown to be more likely true than not.") (citations and internal quotation marks omitted). Given the trial testimony reflecting the extensive nature of Kahre's payroll scheme involving several hundred employees, Kahre's argument is unavailing.

Contrary to Kahre's assertions, the evidence elicited during trial also supports the district court's adoption of the calculation in the PSR of a total tax liability of $57,435,803.52. The total tax liability included $51,739,337.52 in unpaid payroll taxes and $5,696,466.10 Kahre owed in income taxes from 1992 to 2008. Agent Rickey testified that Kahre earned unreported income of $10,758,167.32 in fees from his payroll services, and Agent Cutler calculated that Kahre earned unreported income of $1,956,739 from his companies. These figures more than sufficiently support the district court's tax liability determination.[23]

Kahre next takes issue with the obstruction of justice enhancement, arguing that he did not attempt to conceal his gold and silver payroll system from the IRS, testified honestly about his failure to pay his personal income taxes, and had a good faith belief that his activities were legal. However, the obstruction of justice enhancement was premised on Kahre's false trial testimony. The indictment alleged that Kahre engaged in a conspiracy to defraud the IRS by placing "real property, which he in fact owned, controlled

---

[23] Kahre also appears to challenge the amount of restitution stemming from the calculation of his total tax liability. Although Kahre asserts that there was no factual basis for the restitution amount, the PSR explained that the $16,000,000 restitution amount was calculated from $5,168,313 due in income taxes and $10,891,791.72 due in payroll taxes. Because the district court properly determined Kahre's tax liability using these figures, Kahre cannot establish clear error in similarly calculating the restitution amount. *See United States v. Yeung*, 672 F.3d 594, 600 (9th Cir. 2012) ("We review factual findings supporting an order of restitution for clear error.") (citation omitted); *see also United States v. Jenkins*, 884 F.2d 433, 440 (9th Cir. 1989) (observing that restitution is based on the total tax liability).

and otherwise benefitted from, located at 6295 Grand Canyon Drive, Las Vegas, Nevada, in the name of a nominee, specifically defendant Danille D. Cline." During trial, Kahre testified that he could not have signed a false loan application on behalf of Cline in Las Vegas on September 11, 2011, because he was in Oregon on that date. Kahre's testimony was belied by currency transaction reports reflecting that Kahre cashed checks for $65,000, $143,918, and $26,031 around that date in Las Vegas. The PSR recommended an obstruction enhancement because Kahre "provided materially false information while testifying at trial." In support of the PSR's recommendation, the government argued that "[t]he enhancement relates to the false testimony that . . . Kahre made at trial concerning his whereabouts on September 11, 2001, the day when he and defendant Cline met with Tom Browne to sign a false home loan application for the purchase of 6295 N. Grand Canyon Drive." The district court adopted the PSR's recommendation and held that the obstruction of justice enhancement was supported "by more than a preponderance of the evidence, in fact, by clear and convincing evidence . . ." Kahre does not effectively rebut the district court's finding that he committed perjury when he testified. *See United States v. Armstrong*, 620 F.3d 1172, 1176 (9th Cir. 2010) ("A witness commits perjury if he gives false testimony under oath or affirmation, concerning a material matter, with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. The sentencing judge need only find by a preponderance of the evidence that the defendant committed perjury.") (citations, footnote reference, and internal quotation marks omitted).

The district court's obstruction of justice enhancement is not negated because Kahre terminated his payroll system after

the district court ruled that it was illegal. As discussed, there was ample legal precedent establishing the illegality of Kahre's conduct prior to the district court's ruling to that effect. Unsurprisingly, the district court relied on that existing legal precedent to formulate its conclusion that Kahre's conduct was illegal. Kahre continued to use the gold and silver coins after the search warrants were executed, and apparently only ceased use of his scheme after being indicted. We affirm the district court's calculation of the guidelines range and its related determination of the restitution amount.[24]

Kahre's argument that his sentence is disproportionate is not persuasive. "The district court was not required to conform the sentence to those imposed in similar cases . . . Although comparability is a legitimate sentencing factor, divergence from sentences imposed in similar cases is permissible so long as the court is attentive to relevant sentencing factors, as the district court was here." *United States v. Burgum*, 633 F.3d 810, 813–14 (9th Cir. 2011) (citation omitted). "A district court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before. Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry [Kahre] urges helpful or even feasible. . . ." *United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) (citation omitted). Kahre's below-guidelines sentence

---

[24] Because the district court did not clearly err when it enhanced Kahre's sentence for obstruction of justice, Kahre cannot establish clear error in the court's rejection of a downward adjustment for acceptance of responsibility. *See Rosas*, 615 F.3d at 1066–67 (explaining that an obstruction of justice enhancement "ordinarily indicates" that the defendant has failed to accept responsibility).

imposed for the extensive illegal payroll scheme with its associated tax loss, was comparable to sentences for similar crimes, and was reasonable. *See United States v. Bendtzen*, 542 F.3d 722, 729 (9th Cir. 2008) ("Because a Guidelines sentence will usually be reasonable, [Kahre's] below-Guidelines sentence, supported by the district court's specific reasoning, is reasonable.") (citation and internal quotation marks omitted).

## IV.    CONCLUSION

We affirm Appellants' convictions and Robert Kahre's sentence.  Dismissal of the indictments was not warranted. Appellants had sufficient notice of the illegality of relying on the face value of coins to avoid paying taxes. Longstanding and consistent statutory, regulatory, and court precedent informed the public that gold and silver coins are assessed at fair market value for tax purposes when used to pay wages.

We hold that prosecutors must be removed from a case only if "clear and convincing evidence of a conflict is presented." *Kember*, 685 F.2d at 459.  Appellants failed to present such "clear and convincing evidence."  It follows that the district court did not abuse its discretion in denying Appellants' motions to disqualify the prosecutor.

The district court properly denied as moot Kahre's initial motion to suppress because none of the seized evidence was introduced at trial.  Alternatively, Kahre's arrest and the corresponding search were legally conducted pursuant to a state bench warrant.  The district court correctly denied Kahre's subsequent motion to suppress because the warrants incorporated the accompanying affidavit, which possessed the requisite specificity limiting the agents' discretion.

The district court did not abuse its discretion in excluding evidence challenging the legal import of its ruling that gold and silver coins used to pay wages were to be assessed at fair market value for tax purposes.  The district court correctly recognized that the coins were taxable as property based on their fair market value. *See Cal. Fed. Life Ins. Co.*, 680 F.2d at 86.  Neither did the district court commit reversible error in excluding testimony of Appellants' contemporaneous statements concerning their tax theories.  In each instance the exclusion was neither an abuse of discretion, *see Hinkson*, 585 F.3d at 1263, nor prejudicial.  The district court also acted within its discretion when it excluded, as irrelevant and prejudicial, evidence of the federal agents' use of force during execution of the search warrants.  In sum, the district court did not engage in any misconduct warranting a new trial.

Finally, the district court did not err when sentencing Robert Kahre. The district court's calculation of Kahre's tax liability and the corresponding restitution amount was supported by the evidence presented at trial and by the jury's findings.  The district court's enhancement of Kahre's sentence for obstruction of justice and denial of a downward adjustment for acceptance of responsibility were consistent with the historical record. Kahre's below-guidelines sentence was reasonable and was not disproportionately severe when compared to analogous sentences.

**AFFIRMED.**